J. C. MASON v. THE RICHMOND AND DANVILLE RAILROAD COMPANY.

*Railroads—Negligence—Injury to Employees—Fellow-Servants—Waiver of Injury—Waiver of Regulations.*

1. A rule of a railroad company agreed to by the plaintiff (an employee), may be waived or abrogated for the company by the conductor making an order contrary to such rule, when it was the duty of the plaintiff to obey such order.

2. The conductor is not a fellow-servant of a person employed in coupling cars.

MASON v. RAILROAD CO.

3. When acting under the order of the conductor, but contrary to a
   rule of the railroad company to which he had assented, the plain-
   tiff was injured in coupling defective cars, of which defect he
   had no notice until it was too late to escape: *Held*, that the Court
   erred in withdrawing the case from the jury on the ground that
   plaintiff, upon such facts, could not recover.

4. Discussion by AVERY, J., of the law of negligence in injuring em-
   ployees, and of injury by fellow-servants.

SHEPHERD, C. J., concurring.  BURWELL, J., dissenting.

This was AN ACTION brought by plaintiff against the defend-
ant for damages, as is alleged in the complaint, for personal
injuries done him while in the employment of defendant as
a brakeman, and heard before *Boykin, J.*, at February Term,
1891, of GUILFORD Superior Court.

The plaintiff introduced himself first in his own behalf,
and testified as follows, to-wit: In the month of December,
1889, he was in the employment of the defendant company
as a brakeman, and had been in their employment as such
for about twelve months; that his route was from Greensboro
to Raleigh, going to Raleigh one night and returning to
Greensboro the next night; that on the night of the 14th of
December, 1889, he left Greensboro as usual, and at about six
o'clock in the morning, while it was yet very dark, he arrived
with his train in Durham N. C., and while there the conductor
ordered him to couple to the train some box-cars which were
standing on the siding at that place; that the train was being
backed to the standing cars, when he fixed with his stick the
link in the end of the cars in the draw-head, and also fixed
with his stick the pin in the draw-head of the cars which
were standing still; that when the moving cars came back
against the standing cars, the pin would not go down, and
finding it impossible to couple with his stick, the pin being
bent, he went between the cars and undertook to press the
pin down with his hand, when he heard the cars coming back
upon him.  He was standing with his face to the coupling

and began to back out, but before he had time to get out he was crushed between the ends of the cars, and when the rebound took place he fell out, and was falling to the ground, when he was caught in the arms of the conductor, who was standing near; he immediately became unconscious, and was in the depot lying on a bed when he came again to himself, two or three hours after the injury; he then began to spit up one mouthful of blood after another, and received permanent injury which he has never recovered from to this day; that one of the end cars belonged to the Wilmington, Columbia and Augusta Railroad Company, and the other to the Richmond and Danville, the defendant, and the coupler on each was of the old style; that the most modern improved and suitable coupler now used is what is known as the Janney Coupler, and it is self-adjusting, and can be easily coupled from the outside of the cars; that defendant has a great many of these couplers on its cars; that when he heard the cars backing on him and saw that he was going to be caught between them, he looked to see whether the cars had what are known as buffers or bumpers on them, and saw that they had none. Bumpers are large blocks of wood eight or ten inches long, and fastened on to the end of freight cars on either side of and against the draw-heads; there are two of these on each car, on both sides of the draw head, and on some cars above and below the draw-heads, and are for the protection of brakemen who may be between the cars and to prevent the draw-heads from being broken; the draw-heads, which are in the middle of the lower end of the cars on a freight train, have springs in them, and when the cars come back they give way, so that unless there are bumpers a man will be badly crushed by the cars coming together, and if these cars had had bumpers on the ends the plaintiff could have stood between them when they came back without harm.

Cross-examined, the plaintiff testified: That when he had been in the service of the company some length of time,

some officer of the company brought him the contract marked Exhibit "A," which he signed, and he wrote, in his own handwriting, the following words as a part of said contract, to-wit, "I have read the above and fully understand it."

The defendant then offered in evidence said Exhibit "A," hereunto attached.

The plaintiff then testified that shortly after he signed said contract he told his conductor that it was impossible to couple cars with a stick, at times, without going in between them, and the conductor told him to go in and couple the cars with his hand whenever he could not do so with a stick, and since then he has been going in, as he did on this occasion, to make the coupling with his hand whenever he could not do so with a stick; that he has been going in and making the coupling with his hand five or six times on each trip whenever it became necessary, and that this is known to the officers of the company. Plaintiff said he meant by "officers of the company" the conductor and engineer only, and not the general officers of the company; that it is a matter of impossibility at times, from divers causes, to make the coupling with a stick. The pin is frequently rusty and dirty, being thrown down when taken out by a brakeman and left lying on the ground until needed by some other brakeman who comes along. Sometimes it is bent, and from other causes it is absolutely necessary to go between the cars to make the coupling.

The plaintiff next offered in his behalf Orpheus Cunningham, who testified: That he is a brakeman in the employment of the defendant and has been for many years. That it is impossible to couple cars with a stick at times. Sometimes the engineer, when the coupling is not made at the first trial, pulls up, and after several trials it can be made with a stick. That he is in the habit of going in between the cars to couple with his hand at least five or six times on a trip; that his conductor sometimes sees him coming out from between the cars and tells him that he had better stay

out, as he will get killed in there. Said he had signed a contract like Exbibit " A."

The plaintiff next introduced in his behalf Mr. Jennings, who testified : That he had signed a contract like Exhibit "A," and that he had been in the employment of defendant as a brakeman until last spring for many years ; that it was a matter of impossibility to make the coupling with a stick ; it frequently could not be done ; that he never paid any attention to his stick if the coupling could not be made with it, and was in the habit of going in between the cars five or six times on a trip, acc rding to the amount of coupling required ; that all the conductors knew that brakemen went in to couple with the hand when they could not do so with the stick, and he never heard any objection.

Plaintiff closed his testimony.

The Court then intimated an opinion that the plaintiff could not recover on this evidence and the undisputed facts in the case, in deference to which plaintiff took a nonsuit and appealed.

### Exhibit "A."

" I fully understand that the rules of the Richmond and Danville Railroad Company positively prohibit brakemen from coupling or uncoupling cars, except with a stick; and that brakemen or others must not go between the cars under any circumstances for the purpose of coupling or uncoupling, or for adjusting pins, etc., when an engine is attached to such cars or train; and in consideration of being employed by said company, I hereby agree to be bound by said rule, and waive all or any liability of said company to me for any results of disobedience or infraction thereof. I have read the above, and fully understand it." (Signed by the plaintiff).

*Mr. J. A. Barringer,* for plaintiff.
*Mr. D. Schenck,* for defendant.

AVERY, J.: The Court below held that, upon the whole evidence, the plaintiff had failed to make out a *prima facie* case. The burden was upon the servant suing his employers to show (1) that the machinery was defective; (2) that the defects were the proximate cause of the injury; (3) that the master had knowledge, or might, by the exercise of ordinary care, have had knowledge of such defects. *Hudson* v. *Railroad*, 104 N. C., 491. The question presented by the appeal, therefore, is whether, in any aspect of the evidence, the plaintiff has relieved himself of the *onus probandi* imposed upon him by law.

The first point to be considered is whether the defendant company was negligent in failing to provide what is known as the Janney, or some other improved coupler, which would obviate the necessity, under any circumstances, of going between the ends of cars in order to fasten one to another. The general rule is that it is not the duty of railway companies to furnish machinery of the very best varieties or to attach appliances of the latest and safest kinds, but that it is culpable to use cars or engines of any particular pattern which, on ordinary inspection, would show to be defective. In view of the changes incident to new inventions and discoveries, facts which would not have shown negligence a few years since, may now, or in the near future, be declared in law ample evidence of culpable dereliction in duty, such as involves liability for damages. 1 Shearman and R. Neg., sec. 12. *Blackwell* v. *Railroad*, decided at this term. We think that the time has arrived when railroad companies should be required to attach such couplers, and perhaps airbrakes or appliances equally safe and effective for checking the speed of moving trains on all passenger cars, since as a rule, each corporation uses for carrying passengers none but its own conveyances, and the new couplers have now become so cheap, as compared to the value of the lives and limbs of servants and passengers, that it is not unreasonable to require

that they provide them on peril of answering for any damage which might have been obviated by their use. But, while doubtless the day will soon come when they can be attached at comparatively small cost to all freight cars, it might seriously embarrass our commerce, involving an interchange for the purposes of expeditious transportation of vehicles between all the roads from Canada to Mexico, were every carrier required not only to incur the expense of buying the right and readjusting all of its own cars for the use of the improved fastening, but also to choose between refusing to receive a car of another company without incurring contingent liablility for using it, since the liability of the corporation for such defects in those received from other companies is the same as for defects in its own. Patterson Railroad Acc. Law, 312; *Miller* v. *Railroad,* 99 N. Y., 657; *Jones* v. *Railroad,* 92 N. Y., 628.

It appears from the evidence, that the plaintiff was suddenly called upon on a very dark night to couple to the train two box-cars, standing upon the siding at Durham, one of which belonged to the defendant and another to a different company, and that when the train backed towards the train on the siding, he saw that the pin which he had adjusted with a stick in the draw-head of the car standing on the track would not go down into the link of the draw-head in the moving car, which he had also arranged with his stick, unless he should use his hand to push it down, and in this emergency he rushed in between the cars, as the conductor had ordered him to do whenever he failed in the effort to couple with a stick. After getting between the standing and the moving car he discovered for the first time that there were no bumpers on either car. Bumpers are blocks of wood fastened to the end of a box car, above and below, and on either side of the draw-head, and usually protrude about eight or ten inches, so that they serve the double purpose of preventing draw-heads from being broken by a collision, and of protecting

brakemen who may be between the cars. Draw-heads have springs in them and give way when they come into collision with each other, so that they cannot serve the purpose, like bumpers, of holding the cars apart.

In *Gotlieb* v. *Railroad,* 100 N. Y, 467 (where the facts were that a brakeman was injured in coupling two cars belonging to another company, the bumpers being only three inches long), the Court said: "The defendant was under obligation to its employees to exercise reasonable care and diligence in furnishing them safe and suitable implements, cars and machinery for the discharge of their duties * * * The defect was an obvious one, easily discoverable by the most ordinary inspection, and it would seem to be the *grossest negligence* to put such cars into any train and especially into a train consisting of cars of different gauge. But these two cars did not belong to the defendant. They belonged to other companies and came to it loaded, and it was drawing them over its road. * * * It is not bound to take such cars if they are known to be defective and unsafe. Even if it is not bound to make tests to discover secret defects and is not responsible for such defects, it is bound to inspect foreign cars just as it would inspect its own cars. * * * When cars come to it which have defects visible or discoverable by ordinary inspection, it must either remedy such defects or refuse to take such cars; so much at least is due from it to its employees. The employees can no more be said to assume the risk of such defects in foreign cars than in cars belonging to the company. * * * The defect here complained of was obvious, easily discoverable by the most ordinary inspection, and it seems it could have been easily remedied by simply nailing or fastening additional strips of wood to the ends of the cars, so as to give the bumpers sufficient width to afford the protection needed and intended."

The case being exactly in point, it seems not inappropriate to reproduce the language of Judge EARL from this elaborate opinion, instead of discussing the same question at greater length for ourselves. The general rule is, that when freight cars are obviously so defectively made, whether by a failure to attach bumpers at all or to make them sufficiently long to protect a person standing between the cars when in motion, or in consequence of any other fault in construction, that the slightest indiscretion on the part of an operative may endanger his life, the company is liable for any injury resulting from such defects. *Railroad* v. *Fredericks*, 71 Ill., 294; *Railroad* v. *Jackson*, 55 Ill., 492; *Wedgewood* v. *Railroad*, 51 Wis, 478.

In Gotlieb's case, *supra*, it will be observed that stress was laid upon the fact that the want of a bumper would have been discovered by an ordinary inspection, and in our case, as well as in that, the brakeman was suddenly called upon to pass between two cars, of the condition of which he could not have previously informed himself. Before daylight on a dark morning the duty devolved upon him of attaching a car, which it may be was never south of Wilmington until brought by some freight train with which plaintiff had no connection on the day before to the station where he found it.

In *Johnson* v. *Railroad*, 81 N. C., 453, where the injury to the plaintiff was caused by a defective rod which he had no reasonable opportunity to inspect, Chief Justice SMITH, speaking for the Court, said: "Had the proper examination been made by the defendant, and the rod repaired and strengthened, the accident would not have occurred, and hence it must be ascribed to the defendant's own dereliction of duty. The fault lies with the company and it must bear the consequences." The defendant ought to have examined its own car, and, upon discovering its condition, bumpers could have been placed upon it at comparatively trivial cost, and the same duty of inspection devolved upon it when the other

car was tendered to it, but upon examination it had the option, as will appear from the authorities already cited, of refusing to receive it at all, or of repairing it, so as to make it safe, after it was received.

So, apart from the special contract which is pleaded as a defei ce, the defendant is *prima facie* liable to answer in damages because of its negligence, when its officers ought to have known of the defect and to have remedied it, and it has not relieved itself of this apparent liability by showing that the plaintiff knew or. had opportunity to know the condition of the particular cars on the siding; but, on the contrary, the only testimony on the subject is that of plaintiff, to the effect that he did not see the cars till he had put himself in danger, and then in the imperfect light discovered that there was no bumper on either of those between which he was already caught. *Crutchfield* v. *Railroad*, 76 N. C., 322; *Pleasants* v. *Railroad*, 95 N. C., 195; Shearman & R., sections 92, 94, 95; Cooley on Torts, 561. Leaving the agreement, designated as Exhibit "A," out of view, if there is any testimony tending to show contributory negligence, there was certainly no admitted state of facts which justified the Court in withdrawing the case from the jury, and holding that, in any aspect of the evidence, the injury was caused by the fault of the plaintiff. In Crutchfield's case, *supra*, it was expressly declared, that though the servant assumed the risks of accident, incident to his service, he did not contract to excuse the negligence of the company, unless he knew of the danger to which he was exposed by its want of care, or might by reasonable diligence have known of it, and failed to give notice to his employer so that the defect might be remedied.

The case at bar is not one in which the plaintiff was injured by the fault of a fellow-servant, but by the negl'gence of the master in carelessly retaining on the line and receiving from other carriers palpably defective conveyances, the master

being presumed to know of the danger, which could have been discovered by ordinary inspection, while the servant had no opportunity to know until it was too late to avoid it. The dangerous condition of the car was not, as in Pleasant's case, *supra*, known to both employer and employee, but only to the former. Where the rolling stock or machinery of a company is so defective in its construction, that by an ordinary inspection the company could discover its condition, unless it appear that notwithstanding such want of care on its part the supervening negligence of the servant was the proximate cause of the injury complained of, the company is liable. *Wedgewood* v. *Railroad, supra ; Hudson* v. *Railroad, supra ; Railroad* v. *Valenous,* 56 Ind., 511; Gotlieb's case, *supra.* Another case precisely in point is *King* v. *Ohio Railroad,* 8 Am and Eng. Railroad Cases, 119, in which Judge Gresham, of the Circuit Court, held that a brakeman, in coupling cars, had a right to assume that they are in good and safe condition, and is not negligent in running between cars without stopping to examine and see whether the draw-heads are properly adjusted or not. No more is it his duty to examine bumpers on a dark night before essaying to couple cars.

The cars being palpably defective, and it appearing plainly that the company might, by ordinary care in inspecting them, have known their condition, the defendant still insists that, though the plaintiff may not have been negligent in knowingly incurring risk that he might have avoided, still he was violating a rule of the company of which he had express notice when he passed between the cars to adjust the coupling, and his want of care was therefore the cause of the injury. The authorities which we have cited fully sustain the position that, in the absence of such an agreement, the company would be deemed negligent and the plaintiff would be held free from blame. In addition to those authorities, we can fortify our position more strongly still by recurring to the principle that, notwithstanding any real or supposed

negligence of an injured plaintiff, a railway company is liable in damages if but for its own want of care the injury could have been avoided. *Deans* v. *Railroad*, 107 N. C., 686; *Clark* v. *Railroad*, 109 N. C., 430. If, therefore, we were to concede that the plaintiff was culpable in exposing himself to danger, the carelessness of the defendant would nevertheless be deemed in law the proximate cause of the injury.

Mr. Beach, citing with approval 71 Ill., 294, *supra*, says, "But when the cars are so constructed, the bumpers being of different heights, or being, in any respect, so made that the slightest indiscretion of the operative will prove fatal to him, it has been held that when the injury results from such causes the company is liable." But the case of *Cowles* v. *Railroad*, 84 N. C., 309, it would seem, is so strikingly analagous as upon principle to be decisive of that at bar. If, then, the company was held to be wanting in ordinary care because the cars provided did not so fit each other that the bumpers would keep them apart and prevent collisions, it would seem, where the failure to place any bumpers at all on cars is the proximate cause of a collision in which a brakeman is injured, there would be still more palpable proof of negligence. Justice RUFFIN stated the fact to be, as appeared from the plaintiff's testimony on the trial, "that the brakeman was under the immediate direction and order of one Garrisson, who was the engineer and conductor of the defendant's freight train," and that while executing the order of the conductor, as in our case, the brakeman "was injured in the manner complained of, by a collision of two cars, which collision resulted from the fact that the cars were so constructed that their bumpers did not correspond or fit one another, as they should have done in order to prevent the cars coming in too close contact, which defect was unknown to plaintiff, and but for which he would not have been injured." This Court held that the defects in the cars were such as to establish negligence on the part of the defendant because the defect was so

obvious as to be seen on inspection, and to make it incumbent on the company to show that some subsequent carelessness on the plaintiff was the proximate cause of the injury. The statement as to the relations of the conductor and brakeman was much more meagre, it is true, than in *Patton* v. *Railroad*, 96 N. C., 455, since there the superior, discharging himself the double duties of conductor and engineer, was expressly shown to have the power to employ and discharge the laborers subject to his orders.

The question involved in all such cases is whether the subordinate feels constrained to obey the orders of his superior, though apparently obedience will be attended with peril, rather than run the risk of defying his authority. The fact that the conductor has the power to employ and discharge brakemen on his train, is but evidence to show that the brakemen fear to disobey his commands. The existence of such authority, in the very nature of things, cannot be made the invariable test of the servant's culpability. If the servant never knows or communicates with a higher official than the conductor, and receives every order upon which he acts in the line of his duty from him as a superior, as it is a matter of universal knowledge is the true state of facts on all railroads, is it not reasonable for the laborer to conclude that the conductor has power to waive the requirement of the rule that he has signed, and that, if he refuses to couple cars in accordance with his direction, and thereby delays the departure of a train, he may at least be reported for inefficiency and discharged from the service of the company? If the servant acts upon a well grounded fear of losing his place, the reason of the rule would be met, and he should be declared free from culpability, unless the plaintiff recklessly exposed himself to manifest peril, or chose to subject himself to danger when another safe mode of discharging his duty was open to him, as in *Chambers* v. *Railroad*, 91 N. C., 475.

The elaborate opinion of Justice FIELD in *Railroad* v. *Ross*, 112 U. S., 377, in which he reviews the question, Who are servants engaged in a common employment?—in the light of all the previous decisions in America and England—contains the clearest and most philosophical discussion of the subject to be found in any authority to which we have had access. He announces the conclusion of that Court as follows: " A conductor, having the entire control and management of a railway train, occupies a very different position from the *brakemen*, the porters and other subordinates employed. He is in fact, and should be treated as, the personal representative of the corporation, for whose negligence it is responsible to subordinate servants. This view of his relation to the corporation seems to us a reasonable and just one, and it will insure care in the selection of such agents, and thus give greater security to the servants engaged under him in an employment requiring the utmost vigilance on their part and prompt and unhesitating obedience to his orders. * * * We know from the manner in which railways are operated, that, subject to the general rules and orders of the directors of the companies, the conductor has entire control and management of the train to which he is assigned."

" The true view," says Wharton (Law of Negligence, sec. 232) " is, that as corporations can only act through superintending officers, the negligence of those officers, with respect to other servants, are the negligences of the corporation." The command of the conductor to the brakeman to go between the cars when he could not couple them otherwise, was one to which unhesitating obedience was expected and demanded. The giving of such an order by the conductor ought, upon the plainest principles of right and justice, to be declared a waiver of the regulation by an officer who is the representative of the corporation. That a brakeman feels impelled to obey the orders of the conductor, no observant person can deny; and since we can take judicial notice of a

relation so common and well understood, it would be a voluntary preference of fiction to fact were we to adhere to an arbitrary rule founded in a supposed reason that we know does not exist. A brakeman does not contract to incur the risk of serving under a conductor who will order him to disobey the regulations of the company and leave him to choose on the instant between observing the rules and obeying his superior.

The Supreme Court of Georgia, in *Railroad* v. *Delroy*, 71 Ga., 406, held that while neither a conductor nor any other officer had a right to order an employee to get on or off a moving train, and the employee. was not bound to obey it, yet where the conductor did give the order and the brakeman obeyed it, the act of the conductor was the act of the corporation, and the corporation could not escape responsibility for its own wrong. The Court held in that case that it was immaterial what the rules of the company were, and so, in our case, where the brakeman was ordered to jump between cars instead of from the top of a car, the same principle should prevail.

The Supreme Court of South Carolina held, in *Boatwright* v. *Railroad*, 25 S. C., 129, that " the conductor of a train is the representative of the company and not a fellow-servant with other employees operating the same train under his orders." That case was exactly in point, as the conductor had ordered the brakeman to go between cars because of uneven couplers on freight cars. The same principle is decided in *Coleman* v. *Railroad*, 25 S. C., 446. It has been repeatedly held that an engineer in charge of a train (discharging the duties usually devolving on a conductor in addition to managing the engine) is not a fellow-servant of a brakeman. *Railroad* v. *Brooks*, 83 Ky., 129. The American rule, as distinguished from the English, is that a servant entrusted with the general management of the master's business, or of employees in a particular department, or on detached service

in charge of the train or body of laborers is not a fellow-servant of those who are employed under him and subject to his orders. *Augusta Factory* v. *Barnes*, 72 Ga., 217 ; *Dowling* v. *Allen*, 74 Mo., 13 ; *Chicago* v. *May*, 108 Ill., 288 ; *Chicago* v. *Lundstron*, 16 Neb., 254; *Railroad* v. *Crockett*, 16 N. W. Rep., 921 ; Shearman & Red. Neg , sec. 226.

It will be conceded that though the owner and manager of a manufacturing establishment should make a rule and cause every employee to sign it, to the effect that the employee would not pass between certain machines, go into an engine-room, or expose himself to any specified danger connected with the machinery of the mill, and would hold the owner discharged in advance for any liability growing out of such exposure, yet if the manager should, in the face of the rule, order the servant who signed it to disobey it, and his obedience to orders should expose him to a danger caused by defects in the machinery that on an ordinary inspection would have been obvious to the master, though not so readily discoverable to the servant acting instantly on the order, it would scarcely be contended that the superior who had made the regulation would not thus waive its observance. A corporation is usually governed by its directors, but they may shift its responsible management by such a variety of orders, by-laws and regulations as to make it impossible to discover a real tangible directing head. If, as authority and reason clearly dictate, we consider a conductor in charge of a train as representing the intangible head of the company, then his order is as much a waiver of the regulation as that of the owner or head of a mill.

But speaking for a minority of the Court only, it seems that there should be but little difficulty in arriving at the same conclusion by the solution of another question, to-wit, whether, in consideration of receiving employment, a brakeman can by written agreement "waive the liability" of the company incurred by furnishing cars without bumpers and which can-

111—32

not be coupled with a stick, in the event that he shall be injured in the attempt to fasten the couplings of such cars, under the command of the conductor in charge of the train, with his hands instead of using his stick, as the rule of the company requires, and when the injury is due to the negligence of the company. It is settled as the almost universal rule in America, that though a common carrier of freight by contract upon consideration may relieve itself of the full measure of responsibility as an insurer, no limitation can in that way be placed upon its liability for its own negligence. *Smith* v. *Railroad*, 64 N. C., 235 ; 4 Lawson on R. R., § 1840 ; Lawson on Contracts of Carriers, §§ 29 to 67. The same rule applies to agreements made by common carriers of passengers purporting to restrict their liability for injuries caused by their own negligence. Such contracts are void as against the public policy of the law. 4 Lawson, *supra*, § 1913. This stringent rule of liability is said to rest upon the duty of the government to give unrestricted protection to the lives and limbs of its citizens. Lawson on Contracts, *supra*, §§ 212–220. It would seem that the government owes it to the servant of a carrier to give to him the same protection of life and limb as to the passenger, by declaring void an agreement, in consideration of being employed, to excuse the company for negligence even when it causes death, and it has been so held, as far as our investigations have extended, in all of the Courts except the Supreme Court of Georgia. *Railroad* v. *Sprague*, 44 Ohio St., 471 ; *Railroad* v. *Peary*, 29 Kan., 169 ; *Railroad* v. *Eubanks*, 48 Ark., 460 ; *Railroad* v. *Jones*, 2 Head., 517 ; *Roesner* v. *Hearman*, 10 Miss., 486 ; 1 Lawson on R. R., § 318. It is difficult to draw a distinction between contracts affecting only the safety of goods or animals, or those affecting the lives and limbs of passengers, and those which vitally concern another large class of human beings. If public policy prohibits the recognition of the validity of a contract limiting liability for a paying passenger, or, as most authorities in

this country maintain, even one riding on a free pass, upon what principle can the Courts refuse to extend the same protection to a class of people who are much more exposed to danger, and much more liable to be influenced to sign such agreement?

For the reasons given, we think that the Court below erred in holding that the plaintiff could not recover. This case should have been left to the jury, and the judgment of nonsuit will be set aside and a new trial granted.

BURWELL, J., dissents.

SHEPHERD, C. J., concurring: I concur in the conclusion reached by the Court, but not on the ground that the regulation in question was an unreasonable one. It was not a stipulation against negligence in the ordinary sense of the term, and as long as it remained in force the defendant did not owe to the plaintiff the duty of providing bumpers for its cars. The essential element of negligence is a breach of duty, but, in order to recover, it is not enough for the plaintiff to show a simple breach of duty, but he must also show that the *defendant owes the duty to him.* 1 Shear. & Red. Neg., sec. 8; Beach on Cont. Neg. sec. 6; *Emry* v. *Navigation Co.*, decided at this term.

In the decisions cited, where a recovery was had for negligence in not furnishing bumpers, there was either no regulation like that in present case, or such regulation had been waived. I cannot understand how it was the duty of the defendant to provide against an accident which could not possibly have happened but for a violation of its reasonable regulations. However negligent, then, as to others, the defendant may have been in not seeing that the cars were provided with bumpers, such negligence was not actionable by this plaintiff if his injuries were caused by his disobedience of an existing regulation (known and agreed to by him) *forbidding him from going between the cars under any*

*circumstances for the purpose of coupling, etc.* The evidence, however, tended to show that there was a waiver of the regulation by the conductor in charge of the train, and, in view of the authorities cited, and the convincing reasons given in the opinion, I think that such a waiver was, for the purposes of this action, binding on the defendant. It is upon this ground that I concur in the disposition made of the appeal.

MacRae, J., concurring in the opinion of the Chief Justice.