The following were the issues submitted to the jury and the responses thereto:
"1. Was the plaintiff injured by the negligence of the defendant? Answer: `Yes.'
"2. If so, did the plaintiff, by his own negligence, contribute to his injury? Answer: `No.'
"3. What damage, if any, is the plaintiff entitled to recover? Answer: `$500.'"
S. S. Turner, the plaintiff testified as follows:
"I was injured 25 September, 1894. I was working for the defendant at Dover. I had worked for them nine days. I loaded cars three days and worked around the planing machine five days. Two of these days I helped a boy take lumber from the planer and put on the cars. They put the boy at something else and left me to take the lumber from the planer. While doing this I got my foot cut, I had been working at the planer four days. Carpenter called me to help pull out a board. One end of the board was in the planer and the other had run out of the planer and was on the bench. About twelve feet of the board was (389) out of the planer. Carpenter told me to go up close to the planer where Ricks was and help him pull the board out. I caught hold of the board — the floor was very slick from shavings and oil — and I set my foot up against a cross-piece on the machine to get a purchase to pull. I saw no danger. When I put my foot up the bits or knives caught it. It was done just as I put my foot on the cross-piece. The cross-piece is an iron that extends from one side of the machine to the other. It is a part of the machine. There are two cross-pieces. I *Page 231 
put my foot on the lower cross-piece. The bits or knives caught my foot right above the cross-piece and jerked it up against the upper piece, which caught and stopped my foot. Nearly half of my foot was cut off. There are two knives which revolve on a cylinder. Carpenter was foreman of the shop. Mr. Z. T. Brown, general superintendent of the defendant company, employed me to work. I had pulled boards out of the machine before I was hurt by catching hold of the end, but had never before gone right up to the planer to pull one. The place I usually stood in pulling boards was ten or twelve feet from the machine. In pulling this board I just caught hold there, and Carpenter told me to go up to the planer. This was the first time I ever worked around machinery. Carpenter told me to go to work at the planer. I had before been loading cars. I never had any instructions or warning in regard to the machinery. There is an iron frame in front of the knives, which keeps me, when standing up, from seeing the knives. I thought this frame was a protection against the knives. The knives can be seen by stooping down. I am 23 years old. I was 22 when my foot was cut, 25 September, 1894. I have little education and no business qualifications. My occupation is that of a common laborer. The defendant paid me 75 cents per day. My foot was cut off at the instep . . . . " (390)
Cross-examined: "The cross-piece I put my foot on was two feet from the floor. Carpenter told me to come and help pull out the board. He had hold of it eight feet from the machine and Ricks right at the machine. I caught hold where Carpenter was, and he told me to go up where Ricks was and catch hold. This was all that was said. I knew the knives were there, but thought they were protected. I had been working at the planing machine four or five days. I had seen the front of the machine let down, and I could then see the knives and see where they were. I do not think the shavings hood was bought with the machine. With the shavings hood up I could not have put my foot in. The shavings hood was down when I was injured. I did not take the shavings hood down. I do not remember who took down the shavings hood, but think it was Ricks. He usually took it down. They had been sharpening knives on the machine before 12 o'clock. Carpenter did not tell me not to put my foot up. Ricks had never cautioned me to be careful. Thompson had never cautioned me to be careful about the machine, it was dangerous; but did on one occasion, when I had my hand on the belt, tell me it might hurt me . . . . When I put my foot up to the machine I could see the hole between the cross-pieces. My attention was not attracted to something else, and I was not looking off when I put my foot up."
Reexamination: "Carpenter assisted in adjusting the machine. He would give orders to me and Ricks. He would give orders about fixing *Page 232 
the machine. He was the foreman of the shop. Ricks made any common changes needed in the adjustment of the knives. If (391) anything particular was to be done Carpenter would do it."
James Carpenter, a witness for defendant, testified as follows:
"I am foreman of the shops of the defendant company. I have had experience with machinery twenty years and have been with the defendant company thirteen years. The planing machine at which the plaintiff was injured is as good as is made. It is in good shape, and there is nothing defective about it. On the day the plaintiff was injured we were adjusting the machine by putting on extra knives. After putting on the knives we put a board in to run through the machine to see if it was properly adjusted. When the machine started off I told the plaintiff there were extra knives on, and to get out of the way. He stepped back to where he usually stood, ten or twelve feet from the machine. Ricks ran the plank out and called to the plaintiff to help him. Instead of standing where he was he ran up to the machine, caught hold of the plank and stuck his foot into the knives. I saw Ricks catch at his foot to keep it from going in. I did not tell the plaintiff to help Ricks pull the plank out. The shavings hood is made of heavy sheet tin. It is not part of the machine, but the defendant company had it made to be used with the machine for the purpose of catching shavings and carrying them under the machine. The plaintiff had taken the shavings hood down when we started to adjust the knives. It was necessary to take it down for that purpose. With the shavings hood up the plaintiff could not have been injured. I heard the plaintiff say, about six weeks after he was injured and after he had gotten out of the doctor's hands, that it was his own d__n carelessness that caused him to be injured. When the plaintiff stuck his foot into the knives (392) he was looking across the shop at some colored men. His foot did not strike the cross-piece at all. The cross-piece extends three inches below the knives."
Cross-examined: "A man named Faucette was injured about four years before, while in the employment of defendant, by another machine with a front just like this, and with knives that worked the same way and were protected the same way. Faucette slipped on the floor and his foot caught in the machine. (This evidence was objected by defendant; overruled; excepted.) The machine was operated at Goldsboro without a hood. I did not caution plaintiff when he started to the machine. I cautioned the plaintiff at other times besides the day he was injured to be careful."
Redirect: "We were simply running a plank through the machine to see if the knives were properly adjusted." *Page 233 
Wm. Ricks, a witness for defendant, testified as follows:
"I have been in the employment of the defendant seven years, running a planing machine. The machine by which the plaintiff was injured was a good standard machine. There was no defect in it. The shavings hood was not a part of the machine. It was made to keep the shavings from falling on the floor, and to aid in carrying them off. With the hood up it was impossible for his foot to get into the knives. The plaintiff took down the hood when we started to adjust the knives. It was his business to take the planks as they came out of the machine. His place to stand was twelve feet from the machine. We were running a plank through to see if the knives were working all right. I was pulling the plank out and asked the plaintiff to help me pull it out. The board was twelve feet long and only about twelve inches of it was in the machine. When I asked him to help me pull it out I meant for him to pull where he stood, but he came up to me and raised his foot. I caught at it, but it went on the knives. Carpenter did not say (393) anything to him then. Just before the accident Carpenter cautioned him to stand farther off. I had cautioned him several times before to be careful about putting his hands about the bits or knives while in motion. Thompson, at the time of the accident, was about twelve feet distant, running another machine. The plaintiff could have helped me all right by pulling where he was standing. Carpenter set the knives on this occasion."
Cross-examined: "One could have seen the knives by standing in front of the machine. I have not told the plaintiff I did not caution him. The instructions from the defendant were to keep the shavings hood up while the machine was running, but not while we were adjusting the knives. The instructions as to the hood being kept up were given so the shavings might be carried off."
O. R. Rand, an admitted expert and witness for plaintiff, testified as follows: "I am a machinist and know the machine by which the plaintiff was injured. If you put your foot on the upper cross-bar, your foot will slip and the knives will catch it. [The bar ought to have extended down farther. If it had extended down four inches farther, as planing machines of other makes do that are in common use, there would be no danger, as a man could not possibly get his foot on the knives.] (Evidence in brackets objected to by defendant; objection overruled, and defendant excepted.) An inexperienced man could not see the knives nor their location in the front of the machine. The cross-bars do not come down low enough. If cross-bar was extended four inches lower, or plank put over the space between the bars, which would not *Page 234 
interfere with operating the machine, it would be safe for employees. This machine was dangerous. With shavings hood up plaintiff could not have been hurt."
Cross-examined: "This machine was in common use up to (394) a few years ago, but is being supplanted now by the Glencoe. The machine is still right commonly used. I have known James Carpenter fifteen or twenty years, and his general character is good. He is an experienced machinist and stands at the head of his profession in North Carolina for planing lumber. Rick's character good."
The Court charged the jury on the first issue (in part) that the defendant could not be held responsible for any alleged act or neglect on the part of Ricks or Carpenter, for they were fellow-servants with the plaintiff.
That the evidence shows that the machine was of standard make, in common use and reasonably safe as a planing machine. That a machine may contain a hidden danger and yet not be a defective or unsuitable machine. If it contains such a danger, that bare fact does not make the defendant negligent. Under the evidence in this case you can not find the defendant negligent for not having another or different machine.
["If you are satisfied that the plaintiff was inexperienced in the use of machinery, and that the knives were so arranged as to make them a hidden danger — such a danger as not to be obvious to inspection — then, if the defendant company, by the exercise of ordinary care — as will be hereafter explained — could have foreseen the happening of the accident, it became its duty either to provide an adequate protection against the knives or to give the plaintiff proper warning of the danger."]
The defendant excepted to the part of the charge in brackets.
Could the defendant company, by the exercise of the care to be expected of a man of ordinary prudence, have discovered that the arrangement of the knives, taking in consideration the manner in which the machine was used and the position and nature of the plaintiff's work, was (395) such as to give reasonable cause to apprehend that such an accident might happen, as did happen?
"If the accident was so unusual and unlikely to occur that the defendant, in the exercise of such care, would not have had reasonable cause to apprehend its occurrence, you will answer the issue, `No,' without further consideration."
(To this the defendant excepted.)
"If the exercise of such care would have given such reasonable apprehension, then there was imposed on the defendant the duty of guarding *Page 235 
against its occurrence, not by getting another machine, but by providing an adequate protection against the knives, or by particularly pointing out to the plaintiff the hidden danger."
(Defendant excepted.)
"The evidence shows that the shavings hood while used was an absolute protection. If the defendant gave positive instructions to keep the hood up while the machine was being used, it performed its duty, and you will answer the issue "No." If, however, the instructions were simply to use the hood for the purpose of carrying off the shavings, and if the defendant failed to give the plaintiff proper warning of the alleged hidden danger, it failed in its duty and was negligent."
(Defendant excepted.)
Upon the question whether the defendant had reasonable ground to apprehend the happening of the accident, the Court recited the contentions on both sides, and among the circumstances relied upon by plaintiff mentioned and told the jury they might consider the injury to Faucette, testified to by the witness, James Carter.
(Defendant excepted.)
The Court charged on the second issue (among other things) (396) that plaintiff was bound to use his senses for his own information and protection, and to act and conduct himself with the care that the nature of his work and surroundings required of a man of ordinary prudence in the plaintiff's place.
"If plaintiff ever had information or knowledge, or if by ordinary care he could have had knowledge, that the knives were so arranged and located as to make it dangerous for him to put his foot where he did, he was negligent and the issue should be answered `Yes.'
"If he had ever seen the knives projecting below the bar, then he was negligent in acting as he did, and it made no difference whether or not he had, at the time, forgotten about the location of the knives, the issue should be answered `Yes.'"
There was a judgment for plaintiff for $500, and defendant appealed.
Though the Court instructed the jury that James Carpenter, the foreman, was a fellow-servant of the plaintiff, and there was no exception to that ruling, it has been suggested that none of the exceptions must be discussed for the reason that, in any aspect of the evidence, Carpenter was a vice-principal, and in ordering the plaintiff to put himself in peril relieved him of culpability and rendered the defendant company liable for his carelessness. The test of the question whether one in charge *Page 236 
of other servants is to be regarded as a fellow-servant or a middleman is involved in the inquiry whether those who act under his orders have just reason for believing that the failure or refusal to obey the superior (397) will or may be followed by a discharge from the service in which they are engaged. Mason v. R. R., 111 N.C. 482; S. c.,114 N.C. 718; Shadd v. R. R., 116 N.C. 970; Patton v. R. R., 96 N.C. 455;Logan v. R. R., 116 N.C. 940, at p. 951. Though the authority to employ and discharge the laborers subject to him may be evidence to show that the fear of loss of employment, in case of disobedience of the orders of the company, is well founded, it is not essential that it should always appear that such authority is expressly given. Mason v. R. R.,supra. To concede that is to afford opportunity to evade just responsibility by making the rule (where it neither will nor can be carried into effect) that the power to discharge shall be lodged in another than the immediate superior, though the latter's recommendations of dismissal from service are always acted upon favorably. Mason v. R. R.,supra. The designation as foreman of the business or a branch of it does not, ex vi termini, import, as does the place of conductor or manager of an independent train and its crew, the existence of such authority as would of necessity inspire the fear of suffering such a penalty for disobedience. But, owing to the fact that the foremen of some establishments are clothed with different powers and sustain different relations towards their subordinates from those existing between superior and subordinate in other places, the circumstances in each case must be developed in order to determine whether the under-servant has acted in fear of losing his place on account of a disregard of the command of him who is above him in authority. Where a servant never comes in direct contact with, or receives orders or instructions from one higher in position or power than the foreman, he is justified in looking upon the foreman as the very embodiment of the authority of a corporation. Mason v. R. R., supra; Bailey's Master's Liability, p. 341; McKinney, F. (398) S., sec. 41. There is therefore no inflexible rule, growing out of the name or term, that a foreman exercising authority over those who work in a manufacturing establishment is or is not a vice-principal, but the question whether he is a fellow-servant or alter ego of the company depends upon the proof in each case of the relations subsisting between the two. Wood, Master Servant, sec, 450. Unless the relations of the two are a matter of universal knowledge, it devolves on him who would excuse carelessness on the ground that he was under the obligation to obey an order to show satisfactorily that his relations to the superior, under whose command he acted, were such as to inspire a well-founded fear of dismissal in case of disobedience. Wood, supra, *Page 237 
secs. 449 to 452. Where the servant or his representative meets this requirement the law holds the principal answerable. A corporation can not stipulate against or make regulations to protect itself against the negligence of its servants without running counter to a well-defined rule of public policy. A fortiori, it can not evade its responsibility for the negligence of one who represents the supreme authority of the body in a particular branch or in all of its departments by taking shelter under a published by-law of the company. Mason v. R. R., supra; Wood, supra, sec. 278. Under the evidence developed in this case, it was not made to appear that the authority of Carpenter over the plaintiff was such as to raise the implication that the former represented the company as a vice-principal. The appeal therefore depends upon the merits of the other exceptions.
As to the application of the doctrine that a servant of a company contracts to incur all risks arising out of the negligence of fellow-servants, the Court further instructed the jury as follows: "The evidence shows that the shavings hood while used was an absolute protection. If defendant gave positive instructions to keep the hood up (399) while the machine was being used, it performed its duty, and you will answer the issue `No.' If, however, the instructions were simply to use the hood for the purpose of carrying off the shavings, and if defendant failed to give plaintiff proper warning of the alleged hidden danger, it failed in its duty and was negligent." The duty of the company to warn an inexperienced servant of hidden danger in the use of machinery was explained to the jury as follows: "If you are satisfied that plaintiff was inexperienced in the use of machinery, and that the knives were so arranged as to make them a hidden danger, such a danger as not to be obvious to inspection, then, if defendant, by the exercise of ordinary care, as will be explained hereafter, could have foreseen the happening of the accident, it became its duty either to provide an adequate protection against the knives or to give the plaintiff proper warning of the danger."
Under the instructions the jury evidently inferred from the testimony of the witness Ricks that the orders of the company were to keep the hood down, as was done while the knives were being adjusted and afterwards, till by running a plank through it appeared that they had been properly arranged. The adjustment was being tested by passing a plank through with the hood down, according to the testimony of Carpenter, and, taken in connection with that of Ricks, it was the order of the company to keep the hood down, as was done until the knives were shown by experiment to be in proper place. If the jury believed the hood was down under *Page 238 
such orders when the plaintiff was injured, they were warranted in finding as they did, and the Court did not err in giving the instruction under which they acted in doing so.
(400) If, however, it did not appear that the testimony sent up in the transcript tended to show in any aspect that the hood was left down under the orders of the company, it is too late to take the exception here for the first time that there was in fact no evidence to sustain the charge. S. v. Kiger, 115 N.C. 746; Holden v. Strickland,116 N.C. 185.
There was testimony from which the jury might have drawn the inference that the knives were so concealed from the view of one called upon to work as plaintiff was as to constitute a hidden danger, of which he had received no caution or warning, and had no actual knowledge.
Where the servant has no equal knowledge with the master of the dangers incident to the work, if the servant has sufficient discretion to appreciate the peril, he takes the risk upon himself on continuing in the employment. "Where there are latent defects or hazards incident to an occupation of which the master knows or ought to know, it is his duty to warn the servant of them fully, and, failing to do so, he is liable for any injury which the latter may sustain in consequence of such neglect." Wood,supra (1 Ed.), sec. 349.
Where more than one inference may be drawn from the testimony by fair-minded men as to the controverted questions, it is held in the more recent adjudications of this Court that, after instructing the jury at the request of counsel, if made, as to the law of negligence applicable to particular aspects of the evidence, the Court may submit issues of negligence, with the instruction that it is the province of the jury to say whether the party whose conduct is in question has met the test rule of the prudent man. Hinshaw v. R. R., 118 N.C. 1047 at p. 1054;Russell v. R. R., ibid., 1098 at p. 1111. It is not error in explanation of that rule to tell the jury that the law requires the exercise of such care only as would enable one to provide against danger that he (401) has reasonable ground to apprehend, and that he can by due diligence avoid. A person is not capable and answerable at law for failure to avert or avoid peril that could not have been foreseen by one in like circumstances, and in the exercise of such care as would be characteristic of a prudent person so situated. It was not error to allow the jury, in the light of the other instructions given, to determine whether the defendant had used due diligence to protect the plaintiff, by ordering the hood to be placed over the knives, or by warning the plaintiff against hidden danger.
If the plaintiff had offered to prove that Faucette had been previously injured by a machine of a different kind operated by the defendant, the *Page 239 
testimony would have been clearly incompetent. But where it appeared that the conditions were precisely the same as when he was injured, the circumstance was properly allowed to go to the jury, as tending to show reasonable ground to apprehend like danger, if the knives should not be covered, when in motion at any subsequent time. Pomfrey v. Saratoga,104 N.Y., 469; District of Columbia v. Ames, 107 U.S. 519; Quinland v.Utica, (74 N.Y. 603,) 11 Hun., 117; Emery v. R. R., 102 N.C. 209,228.
The evidence tended to show that the shape or extent of the hood could have been readily changed. It was admitted that the witness Ricks was an expert machinist. He testified that if the bar had extended four inches further down, as other planing machines do, there would have been no danger of catching or injuring the plaintiff's foot. If the testimony was material, it was clearly within the peculiar domain of an expert witness. The question whether a certain machine, or a given condition of the same machine, is dangerous is not so readily determined by untrained persons as by an experienced machinist. He had peculiar means of knowing whether there was danger and how it could have been averted in operating a machine. The testimony was material, (402) because it tended to show that the plaintiff could have removed the danger by a little alteration in the machine, and because his leaving the knives exposed with a knowledge that they were more dangerous when uncovered than other similar knives, and that another servant had been injured in the same way, were circumstances from which the jury might have inferred a want of care. The defendant was not bound to procure the best machinery, but it was its duty to exercise greater care when that in use was known, or might by inquiry and inspection have been ascertained to be, dangerous than when it was comparatively safe under all circumstances.
It is a well-settled principle that the care which the law requires of one who is using dangerous machinery becomes greater as the hazard increases. Upon a review of the whole case the judgment is
AFFIRMED.
Cited: Purcell v. R. R., post, 737; Williams v. R. R., post, 749;Rittenhouse v. R. R., 120 N.C. 546; Pleasants v. R. R., 121 N.C. 495;Johnson v. R. R., 122 N.C. 958; Ward v. Odell, 126 N.C. 954; Smith v.R. R., 129 N.C. 177; Kiser v. Barytes Co., 131 N.C. 615; Lamb v.Littman, 132 N.C. 980; Marks v. Cotton Mills, 138 N.C. 408; Ruffin v.R. R., 142 N.C. 127; Hipp v. Fiber Co., 152 N.C. 747; Horne v. R. R.,153 N.C. 240; Beal v. Fiber Co., 154 N.C. 155; Ensley v. Lumber Co.,165 N.C. 692; Hollifield v. Telephone Co., 172 N.C. 724; Sumner v.Telephone Co., 173 N.C. 31. *Page 240 
(403)