STEVE GREENLEE v. SOUTHERN RAILWAY COMPANY.

(Decided May 26, 1898.)

*Action for Damages—Railroads—Master and Servant— Negligence—Self-Coupling Devices.*

1. The failure of a railroad company to equip its freight cars with modern self-coupling devices is negligence *per se*, continuing up to the time of an injury received by an employee in coupling the cars by hand for which the company is liable whether such employee contributed to such injury by his own negligence or not.

2 The former decisions of this Court touching upon the duties of railroads to provide modern appliances for coupling cars otherwise than by hand and foreshadowing the early holding that the failure to do so would be negligence *per se*, and the Act of Congress (27 U. S. Statutes at Large, p. 531) requiring self-couplers to be placed on all cars by January 1, 1898, and the general adoption by railroads of such self-couplers, made it the duty of defendant to adopt such devices, and its failure to do so, whereby an employee was injured, was negligence *per se*.

3. The fact that an employee remains in the service of a railroad company, knowing that its freight cars are not equipped with self-couplers, does not excuse the railroad from liability to such employee if injured while coupling its cars by hand, the doctrine of "assumption of risk" having no application where the law requires the use of new appliances to secure the safety of employees

122—62

Greenlee v. Railway.

and the employee, being either ignorant of the law's requirement or expecting daily compliance with it, continues in the service with the old appliances.

FAIRCLOTH, C. J., and FURCHES, J., dissent.

CIVIL ACTION for damages tried before *Greene, J.*, and a jury at Fall Term, 1897, of McDOWELL Superior Court. The plaintiff, through the alleged negligence of the defendant company, his employer, was injured while coupling freight cars by hand at Asheville and suffered the loss of an arm. The cars were not equipped with self-couplers. The facts are fully stated in the . dissenting opinion of Associate Justice Furches. There was a verdict for the plaintiff awarding him $1,500 damages and from the judgment thereon the defendant appealed.

*Messrs. E. J. Justice* and *John T. Perkins* for plaintiff.
*Messrs. G. F. Bason, Chas. Price* and *A. B. Andrews, Jr.*, for defendant (appellant).

CLARK, J.: In any aspect of this case the defendant is liable, whether the plaintiff was or was not guilty of contributory negligence for the negligence of the defendant in not having self-couplers, and in sending a man to couple cars at all was a continuing negligence which existed subsequent to the contributory negligence, if there had been any, of the plaintiff and was the proximate cause, the *causa causans* of the injury.

Six years ago (1892) in *Mason v. Railroad*, 111 N. C., 482, at p. 487, the court in considering "whether the defendant company was negligent in failing to provide what is known as the 'Janney,' or some other improved coupler which would obviate the necessity under any circumstances of going between the ends of cars in order to fasten one to another," said: "We think that the time

has arrived when railroad companies should be required to attach such couplers . . . on all passenger cars . . . and the new couplers have now become so cheap, as compared to the value of the lives and limbs of servants and passengers, that it is not unreasonable to require that they provide them on peril of answering for any damage which might have been obviated by their use." While the court declined, on account of the expense to hold that the same was true at that time as to freight cars, it added "Doubtless the day will soon come" when it would be negligence not to attach them to freight as well as passenger cars. Congress so thought, and in 1893 passed an Act (27 U. S. Statutes at Large, p. 531) requiring self-couplers and air brakes to be placed on all cars, freight as well as passenger, by January 1, 1898, and this had been complied with as to "over 60 per cent. of the freight cars" besides nearly all passenger cars, operating in inter-state commerce, by that date. In *Witzell* v. *Railway*, 120 N. C , 557, the above citation from *Mason* v. *Railroad* was approved, and the court held that, while it was not negligence to fail to provide the latest improved appliances, a railroad company was liable for any injury caused by the failure to use approved appliances that are in general use.

The railroad companies have of late procured from the Inter-State Commerce Commission an extension, till January 1, 1900, of the time by which self-couplers must be placed upon all freight cars used in inter-state service, but this was for their accommodation and did not and could not relieve them from the legal liability incurred for injuries caused by their failure to provide "suitable appliances in general use" where the use of such would have prevented the injury. It only relieved them from the penalty provided in the Act of Congress.

The Eleventh Annual Report (1897) of the Inter-State Commerce Commission, issued by authority of the United States Government and based upon the reports of the railroad companies themselves, shows (p. 80) that of railroad employees (leaving out passengers altogether) 1,861 were killed and 29,969 were wounded in the year ending June 30, 1896, being greater loss than in many a battle of historic importance. Of the train men, this report (p. 130) shows that nearly one in nine had been killed or wounded that year—a total of over 17,000. Of these casualties it is officially stated, 229 were killed and 8,457 were wounded in this single particular of coupling and uncoupling cars. As these figures are reported by the corporations themselves, it is not probable that they are over-stated. If the railroads not reporting to the Inter-State Commerce Commission (because not engaged in inter-state carrying) should be added, the figures of killed and wounded from this cause would doubtless be largely increased. By these figures, for the last year reported, nearly 9,000 men had been killed and wounded in coupling and uncoupling cars. As the corporations on their own motion or under compulsion of Congressional action and judicial decision, have adopted self-couplers on the passenger cars and on "over 60 per cent." of the freight cars, it will be seen how many thousands of lives and bodies have been saved thereby, but that still nearly 9,000 men should in one year be killed or wounded "coupling and uncoupling cars" on the freight cars which, up to June 30, 1896, still lacked self-couplers, is the highest proof of the duty of the courts to enforce liability for failure to provide self-couplers in every case where an injury occurs from that cause. That nearly 9,000 men should still be killed and wounded in one

year for failure to furnish appliances which are so widely in use and which would entirely prevent such accidents, points out the duty of the courts.

In Witsell's case, *supra*, at p. 562, this court says: "If an appliance is such that the railroads should have it, the poverty of the company is no sufficient excuse for not having it." But in fact this defendant reports that it has issued bonds and stocks to the amount of $76,557 per mile (N. C. R. R. Com. Report, 1896, at p. 246.) This is presumed to have been paid in by its issuing them, and hence it should be able to furnish appliances which will protect its employees from such injuries as this, and should be held liable for failure to do so, especially as the Inter-State Commerce Commission report shows that the self-couplers can be put on at the cost of $18 per car.

In a large majority of the States, as well as by the Federal Government, railroad commissions have been created to supervise and regulate the charges and the conduct of these corporations. The courts will be very derelict in their duty if they do not enforce justice in favor of employees as well as the public. Six years ago this court said it would soon be negligence *per se* whenever an accident happened for lack of a self-coupler. Congress has enacted that self-couplers should be used. For their lack this plaintiff was injured. It is true the defendant replies that the plaintiff remained in its service, knowing it did not have self-couplers. If that were a defence, no railroad company would ever be liable for failure to put in life-saving devices and the need of bread would force employees to continue this annual sacrifice of thousands of men.

But such is not the doctrine of "assumption of risk." That is a more reasonable doctrine and is merely that

when a particular machine is defective or injured, and the employee, knowing it, continues to use it, he assumes the risk. That doctrine has no application where the law requires the adoption of new devices to save life or limb (as self-couplers), and the employee either ignorant of that fact or expecting daily compliance with the law, continues in service with the appliances formerly in use.

The defendant, after notice of six years from this court, and with notice of the Act of Congress, and also from the general adoption of self-couplers that it should use them, was guilty of negligence in failing to do so. The injury to the plaintiff could not have occurred save for the failure of the defendant to comply with its duty in this regard, and the court below should have held it liable to the plaintiff upon the defendant's own evidence. Hence, if there was error, which we do not admit, it was necessarily harmless error. There was plainly no error upon the issue as to the amount of damages.

Affirmed.

FURCHES, J., dissenting: The plaintiff was an employee of the defendant company as a laborer on its yard, at its station in Asheville, and while so employed was injured by defendant, for which he brings this action. The yard was under the management and control of one Adams, under whom the plaintiff worked, and Adams had the right to discharge the plaintiff for disobedience of his orders. A part of the business of the plaintiff was to couple and uncouple cars, and when he was employed he was told he must not couple with his hands, but with a stick. At the time of the injury Adams and his force, among whom was the plaintiff, were engaged in making up a train on a side track by taking cars off the main track and putting them on the

side track.   This was done by what is called "kicking the cars," that is by pushing a car with the engine, at the start, and then letting the car run by its own momentum.   There had been two cars kicked down the track and they had become stationary, and the plaintiff was injured when the third car was "kicked" down.   The plaintiff contends that he was injured between the first and second cars "kicked" down, and the defendant contends that he was hurt between the second and third cars "kicked" down.

The plaintiff contends that he was injured in attempting to put in a coupling link, which could only be done with the hand; and the defendant contends that the plaintiff was hurt in attempting to make a coupling with his hand instead of with a stick as he was directed to do, and in this way contributed to his injury, and that this negligence was the proximate cause of the injury, and plaintiff cannot recover on that account.

It was in the night (dark) when all this occurred, and the plaintiff had a lantern, and his theory is that the second car being between him and the engine, he could not see the engine and the third car; that it was this third and last car kicked down the track, striking the second car, which caused it suddenly and violently to crash against the first car, that caused the injury; that Adams knew he was between these cars—that he had just before the injury told the plaintiff to "hurry up with coupling the cars on the side track, as train No. 44 was coming, and he wanted to get out of the way." The plaintiff offered other evidence besides his own, tending to sustain his contention, and the defendant offered evidence to contradict the plaintiff—to show that the injury of plaintiff was received between the second and third cars while attempting to effect a

coupling with his hand, contrary to orders. And among other evidence introduced for this purpose was the testimony of Dr. Hilliard who testified that he was the surgeon of the defendant and was *required by the company to examine—to poll—the plaintiff* as to how he got hurt. And if he got any thing favorable to the company, we suppose he was to become a witness for it. This evidence was objected to by the plaintiff, but we think it competent as declarations of the plaintiff, to be taken by the jury for what it was worth, considering the circumstances under which it was taken. The defendant contended that it was competent as a part of the *res gestae,* and cited *Southerland* v. *Railroad Co.,* 106 N. C., 100, as authority for this position. *Southerland* v. *Railroad,* is based upon entirely different principles. In that case, it was as to what the engineer—a third person—said, and of course it was hearsay, unless it was a part of the *res gestae.*

This appeal depends upon the charge of the court —upon prayers given and prayers refused, as there seems to have been no charge except what is contained in the prayers for instruction. It was important to determine the question whether the injury was received between the second and third cars as plaintiff contended, or between the second car kicked down and the last car as defendant contended. If between the two cars, as contended by plaintiff, his theory is consistent, whether correct or not; while, if it occurred between the two last cars kicked down, his theory would appear to be inconsistent with his contention that he could not see the approaching car, as there would be no intervening car to prevent his seeing the approach of the last car, if he was hurt between the two last cars kicked down. It does not seem to us that the jury were sufficiently

instructed as to this; and it also seems to us that there is too much said in plaintiff's prayers for instruction (which were given) about the pin not being in its proper place, and having to be hunted by the plaintiff, this not being supported by evidence in the case.

There was no *written* contract between plaintiff and defendant that plaintiff should not couple cars with his hands. But it was in evidence and admitted by the plaintiff that when he hired to the defendant he was instructed never to couple cars with his hands.

But the court was asked by the plaintiff to charge the jury that plaintiff had signed no written contract not to couple with his hands and, this being so, the rule of the prudent man applies, that is, did the plaintiff act with ordinary prudence and care in attempting to make this coupling, if he was making a coupling, and if he did, he would not be guilty of negligence. The court gave this instruction and defendant excepted. In this there was error. There is no special virtue in contracts of this kind being in writing. There is no statute requiring them to be in writing, and it does not appear to us that this was a contract, but an instruction from Adams, the man who employed the plaintiff.

But the plaintiff contends that whether it was a contract or an instruction, it was abrogated by Adams' saying to the plaintiff "Hurry up with your coupling, No. 44 is coming and I want to get out of the way." If Adams said this, it does not revoke or tend to revoke the instruction before given "not to couple with his hands." *Mason* v. *Railroad*, 114 N. C., 718, on page 723. There is no evidence showing or tending to show that Adams knew or had reason to know that the plaintiff could not effect a coupling as quickly with his stick as with his hand. If plaintiff's contention were correct, it

would be dangerous for a railroad "boss" to hurry up his hands, lest he abrogated all former orders and directions. This order was not inconsistent with the previous instruction and does not fall within *Shadd* v. *Railroad*, 116 N. C., 968; *Patton* v. *Railroad*, 96 N. C., 455.

There were other exceptions discussed by counsel but they will probably not arise on a new trial, and we do not discuss them.

The plaintiff by accepting service under the defendant to work on its yard in shifting and coupling cars, accepted all the ordinary risks of this service, without the special instruction not to couple with his hands. But it seems to us that, as a matter of economy, to say nothing of the suffering and loss of human life, railroads would be induced to get and use the more modern and safer appliances. They will have to do this soon, or answer for damages caused by the lack of them.

This was written as the opinion of the court; but since it was written the Court has changed its opinion, and I file it as my dissenting opinion.

FAIRCLOTH, C. J.: I concur in the dissenting opinion.