Tutrix vs. Sellers & Co.

## No. 9941.

MRS. JOHN FAREN, WIDOW AND TUTRIX, VS. T. J. SELLERS & CO.

Under a written contract by which the contractor agrees to demolish a building, but containing a clause that "the work of demolition is to be carried out according to the directions of the supervising architect, whose decisions on all points I agree to accept as final," held: that this operated such a reservation of control over the work as prevented the contractor from being independent, and created the relation of master and servant.

Held: That even if the relation of contractor and contractee existed, yet, if the latter personally interferes in the work, or some part of it, he is responsible for any injury to a servant of the contractor occasioned by such interference.

Held: If an injury results to a servant from the combined negligence of the master and fellow-servant, the master is responsible notwithstanding the contributory negligence of the fellow-servant.

The master is responsible for the negligence of a servant who stands as his vice-principal and direct representative, invested with his own authority over inferior servants, and the latter, when injured by such negligence, are not barred by the doctrine of fellow-servant.

A servant is only bound to see patent, not latent, defects; mere knowledge of defects will not bar recovery for resultant injury unless accompanied by knowledge that they are necessarily dangerous, and he has a right to rely on the superior knowledge and judgment of his master, and to act on the assumption that the latter will not expose him to evitable risk, and has taken proper precaution to guard him from danger.

When the master has created the danger, he is bound to guard against it, and if he himself does not know or believe that the danger exists, he cannot require superior knowledge and judgment from the servant.

<table>
<tr><td>39</td><td>1011</td></tr>
<tr><td>46</td><td>185</td></tr>
</table>

<table>
<tr><td>39</td><td>1011</td></tr>
<tr><td>48</td><td>981</td></tr>
</table>

<table>
<tr><td>39</td><td>1011</td></tr>
<tr><td>50</td><td>728</td></tr>
<tr><td>50</td><td>1168</td></tr>
<tr><td>51</td><td>184</td></tr>
</table>

<table>
<tr><td>39</td><td>1011</td></tr>
<tr><td>106</td><td>412</td></tr>
</table>

<table>
<tr><td>39</td><td>1011</td></tr>
<tr><td>108</td><td>365</td></tr>
</table>

<table>
<tr><td>39</td><td>1011</td></tr>
<tr><td>109</td><td>403</td></tr>
</table>

<table>
<tr><td>39</td><td>1011</td></tr>
<tr><td>114</td><td>1073</td></tr>
</table>

APPEAL from the Civil District Court for the Parish of Orleans. Houston, J.

*Harry H. Hall*, for Plaintiff and Appellee:

1. Master and Servant. The risk assumed by the servant is the ordinary hazard incident to the employment, and this is synonymous with unavoidable accident. Wood, Master and Servant, p. 738. Unless the act is necessarily and inevitably dangerous, no negligence. Do. 739, 681. It is not contributory negligence, *per se*, to engage in a dangerous occupation. Beach, Contrib. Neg. 370 ; Wood, p. 763.

2. The servant has a right to rely upon the care and superior knowledge, information, and judgment of the employer. Wood, pp. 749, 751 ; Thompson, Neg. p. 975.

An employee is not bound to inquire as to latent defects. He has a right to presume that this injury has been made by the employer upon whom the duty devolves, and although the servant may know of the defects, this will not defeat his claim, unless he knows that the defects are dangerous. Wharton, Neg. § 215.

3. A proprietor who retains control may direct what shall be done without liability for injury to the contractor's servants, provided he does not retain control of the means and method of its accomplishment. Wood, 599 ; v. 594 ; v. 7 Ann. 321 ; 45 Ills. 455 ; 15 Wall, 649.

4. The master is liable for subjecting the servant, through negligence, to greater risks than those which fairly belong to the employment. Negligence, for which the master is liable, is:

1. Negligence in subjecting the servant to the risk of injury from defective buildings or premises ;

2.  Negligence, where the master, or his vice-principal, personally interferes, and either does, or commands the doing of, the act which caused the injury. Thompson, Neg., 2, 969; Beach, Contrib. Neg. 311, 350; Wood, Mast. and Serv. 676, 837, 699, 843; Wharton, Neg., § 205.

The employer may be guilty of personal neg'ect, connecting itself with the negligence of the contractor, so as to render both liable. Cooley, Torts, p. 548.

5.  Whenever the negligence of the master, united to the negligence of a fellow-servant, contributes to the injury, the servant injured thereby may recover from the common employer. Beach, Con. Neg. 313; Wharton, Neg., § 234, 913; Thomp., Neg., ii, 913.

6.  The owner is bound by the same legal obligation to the servants of the contractor, that exist as between him and his own servant, to keep the premises in a safe condition, and is liable to any of the servants of such contractor for injuries resulting to them from defects therein, not under a contract obligation, but by force of the maxim: *Sic utere tuo ut non alienum lœdas*. Wood, 699; Wharton, §§ 232, 234, 199 note; Cooley on Torts, p. 549.

7.  The servant need only raise a reasonable presumption of negligence or fault on defend ant's part. The jury may fairly infer from the fact that he had performed similar acts in safety that he was not guilty of negligence in attempting to perform the act which caused the injury. Wood, Master and Servant, p. 777.

*Chas. S. Rice,* for Defendants and Appellants:

Wood on the Law of Master and Servant, p. 593: "When a person lets out work to another to be done by him, such person to furnish the labor, and the contractee reserving no control over the work or workmen, the relation of contractor and contractee exists, and not that of master and servant, and the contractee is not liable for the negligent or improper execution of the work by the contractor."

P. 598.—"Where a person lets work to be done by another, by contract, or job, which is innocent and lawful in itself, but which may, if carelessly or negligently done, result in injury to another, he is not charged with liability if such work is, in fact, carelessly and negligently performed. He is only liable in such cases when the work to be done necessarily creates a nuisance. When it is lawful in itself and in all its details, he is not liable for the acts of the contractor or his servants, unless he retains control over the work and the instruments of its performance. He may personally, or by an agent, superintend the work, and direct as to what shall be done, provided he does not retain control over the method and means of its accomplishment. Thus, where a person, in erecting a building upon a public street, lets out the stone work to be done by a contractor, under the direction and to the satisfaction of a superintendent employed by him, this reservation is not such a reservation of control over the method and instruments of accomplishing the work, as renders him liable for an injury resulting from the negligent execution of the work by the contractor." See Park vs. Mayor, etc., 4 Selden, N. Y., 222; Gallagher vs. Southwestern Exposition, 20 La. 943; see, also, Wood on Railway Law, vol. 2, p. 1009 *et seq.*; Patterson's Railway Accident Law, p. 119 to 130, Hunt vs. Penn. R. R. Co., 51 Pa. Stat. 475; 80 Pa. Stat. 105-6, Wray vs. Evans; Shearman & Redfield on Negligence, p. 95; Camp vs. Warden St. Louis Church, 7 Ann. 324-6.

Even if there were serious doubts as to the meaning of those parts of the contract, which have been, it is contended, incorrectly interpreted in plaintiff's petition, their interpretation by the conduct of the parties thereto, which would create the law as to third parties, removes that doubt.

Art. C. C. 1956—"When the intent of the parties is doubtful, the construction put upon it, by the manner in which it has been executed by both, or by one with the express or

Tutrix va. Sellers & Co.

implied consent of the other, furnishes a rule for its interpretation." See Charge to
Jury, Record, p.

" *Optima legum interpres consuetudo,*"

And if there were doubts, the interpretation would be in favor of these defendants.  Art.
C. C. 1957.

Beach on Contributory Negligence, p. 369: " The servant is held, by his contract of hiring,
to assume the risk of injury from the ordinary dangers of the employment; that is to
say, from such dangers as are known to him, or discoverable by the exercise of ordinary
care on his part.  He has, therefore, no right of action, in general, against his master for
an injury befalling him for such a cause.  His right to recover will often depend upon
his knowledge or ignorance of the danger.  If he knew of it, or was under a legal obli-
gation to know it, it was a part of his contract, and he cannot recover."

P. 368—" If the servant runs the risk with his eyes open, he will ordinarily have no reme-
dy, no matter what the knowledge on the part of the master."

P. 370—" It is the rule applicable to this subject, that, if the servant, when the defect or
danger is brought to his knowledge—when he discovers that the machinery, buildings,
premises, tools or any other instrumentalities of his labor are un afe or unfit, or that a
fellow-servant is careless or incompetent—continues in the employment, without pro-
test or complaint, he is deemed to assume the risk of such danger, and to waive any
 claim upon his master for damages in case of injury."

Cooley on Torts, p. 451—" The terms in which the proposition has been stated will exempt
the master from responsibility in all cases where the risks were apparent and volun-
tarily assumed by a person capable of understanding and appreciating them."

Leary vs. Boston and Albany R. R. Co., 139 Mass. 584: " But the servant assumes the dan-
gers of the employment to which he voluntarily and intelligently consents, and, while,
ordinarily, he is to be subjected only to the hazards necessarily incident to his employ-
ment, if he knows that proper precautions have been neglected, and still knowingly
consents to incur the risk to which he will be exposed thereby, his assent will dispense
with the duty of the master to take such precautions."

In Coombs vs. New Bedford Cordage Co., 102 Mass. 596, the Court charged the jury that,
" if the plaintiff, being of sufficient age and intelligence to understand the nature of the
risk to which he was exposed, and with full notice of the dangerous nature of the ser-
vice which he undertook, chose to contract to do it, he assumed all such risks as were
clearly within the scope of his employment, and no implied contract could arise on the
 part of the master to indemnify him against the consequences of such risks."

" The instructions," said the Appellate Court, " were carefully framed and well adapted to
impress the true distinctions upon the minds of the jury."

Cooley on Torts, p. 155—" It has often been, and very justly, remarked, that a man may de-
cline any exceptionally dangerous employment. but if he voluntarily engages in it, he
should not complain because it is dangerous."   .

In an English case, Thomas vs. Quartermaine (Railway and Corporation Law Journal,
April 30, 1887), the High Court of Appeals said: " The workman who goes to work at
a particular place, or continues working there with knowledge of the state of things
there existing, does so voluntarily, and has himself caused his exposure to the risk."

A very clearly stated case, upon this point, but too extended to quote, is that of Sullivan,
Administrator, vs. Louisville Bridge Co., 9 Bush (Ky.) 85.

In Assops vs. Yates, 2 Hurl. & Normans, 767-70, it was contended that there was case for
the jury.  "We think not," said the Court, "first, after having complained of the
hoarding [without promise of remedy], and knowing all the circumstances, he volun-
tarily continued the work."

See, also, Dillon vs. Union Pacific R. R. Co., 3 Dillon, 328; Hough vs Railway Co , 100 U. S. C., 224; Kelley vs. Silver Spring Co., 34 Am. Rep. 615-620; Thompson on Negligence, vol. 1, pp. 1008, 905, 996, 936-7, 940 2.

In Sweeney vs. Bertin & Jones Envelope Co., 5 N. E. Rep. 359, a very recent case decided by the Court of Appeals of New York, that Court said: "The servant accepts the service subject to the risks incident to it; and where the machinery and implements of the employer's business are, at the time, of a certain kind and condition, and the servant knows it, he can make no claim upon the master to furnish other or different safe guards."

Cases could be added *ad libitum*.

While the defense goes to claim of plaintiff, it is submitted that, even if liable, the verdict of the jury against them is excessive. Poirier vs. Carroll 35 Ann. 708.

---

The opinion of the Court was delivered by

FENNER, J. The defendant firm became the purchaser of the immense structure known as the Main Building of the World's Exposition, erected in the Public Park of the city of New Orleans. The object of the purchase was to demolish it and to convert its materials into marketable lumber. The building was one of the largest ever constructed, covering a space of about 1300 by 900 feet. It was built for a temporary purpose and with great haste. The height and breadth of its spans were unusually large and many of the timbers were of great size and weight, the whole secured by an elaborate system of rafters, ridge-pieces, purlines, braces, etc. The work of its safe demolition was one of great magnitude and requiring skill and care.

Defendants entered into a written contract with one J. H. Lynch, the pertinent portions of which are as follows: that Lynch was "to take down and lower on to main or ground floor of building the *whole* of the *trusses* of various sizes, namely, the 75 foot spans and fifty foot spans. In effect, the *whole* of the internal framing of the building with the exception of that portion known as the gallery section, etc., etc." * * * "The word *truss*, or section aforenamed *is to mean the whole of the frame work which is in position or place between two uprights or posts, and to include plates, braces, jack-rafters, ridge-pieces, purlines, double posts or uprights supporting plates on which foot of seventy-five and fifty foot spans rests*, and also includes the main uprights or posts, the whole to be lowered and piled in their respective sizes and scantlings, etc." Lynch further agreed "to use all necessary and proper braces, struts, etc., so as to secure the safety of the various parts or portions of the above building. The whole of the work of demolition to be carried out *according to the directions of the supervising architect, whose decisions on all points in dispute, I (Lynch) agree to accept as final.* If, at any time, I do not use due diligence and do not push the work

or carry it out to his satisfaction, and notice in writing having been given me and I failing to carry out the ·instructions, I agree to forfeit this contract and give up all claim to any money or moneys that may be due to me. I do further agree to accept all responsibility with regard to any accident that may befall or happen to any of my employees or laborers." Lynch was to receive $5.00 for each truss lowered, " weekly payments to be made at the rate of fifty *per cent.* on amount of work done on certificate from supervising architect, the remainder to be paid on completion."

We take occasion now to say that the agreement as to Lynch's responsibility for accidents to employees is *brutum fulmen* at to plaintiff, and this is admitted by defendant's counsel.

The supervising architect, referred to in the contract, was one employed by Sellers & Co., who resigned immediately afterwards and no other was employed, the only substitute being a police officer having no pretensions to being an architect, whom Sellers & Co. engaged simply to keep the record of Lynch's work and to give him certificates for payment.

Immediately after the contract, Sellers & Co. proceeded, through other employees, in advance of Lynch's work, to strip the building, not only of the sheathing but of many of the important braces and purlines. The purlines are heavy cross-timbers connecting the immense successive trusses or spans with each other, fitted at each end into a slot in the trusses and secured by nails. They were of prime importance in strengthening and maintaining the structure. There were 18 of them between each pair of trusses. Sellers & Co. removed all except one on the 50 foot spans and three on the 75 foot spans, the last being one running along the crest of the trusses and one on each side. The testimony is conflicting as to the number and location of the braces removed, and the matter is of slight consequence. There is no question that the result of Sellers & Co.'s work was to weaken the structure beyond the point of security, to make it dangerous to the lives of all who entered it and to add enormously to the hazard of Lynch's work. In point of fact, over forty of the trusses fell of their own weight at different times, and without doubt the whole of the structure was weakened, jarred and in many parts thrown out of plumb. The building was thereby converted into a public nuisance dangerous to all who approached it, and it was subsequently condemned as such in an official report of the city surveyor.

The expert witnesses all agree that the method of demolition thus adopted by Sellers & Co. was improper, unsafe and unscientific, and

that the braces and puriines, or at least a greater number of them, should have been left for removal in connection with the trusses themselves as evidently contemplated by the contract, and as no doubt would have been done had the work proceeded under the direction of a competent architect.

Under this condition of affairs Lynch proceeded with his work and safely removed a large number of the trusses. The method of removal adopted was to bring a derrick up close to the truss and lash the latter securely to the derrick so as firmly to support it and hold it in position; then to fasten a gant line to the purline and to disengage the latter from the truss by tension on the gant line, to tear it from its fastenings and then to lower it.

On the occasion with which we are concerned this work had progressed as usual, the truss had been secured to the derrick, and Faren, Lynch's employee, reached over on the purline for the purpose of fastening the gant line to it, when the purline slipped from its supports, plunging Faren in a fall of seventy-five feet, accompanied by the purline itself which fell on him, occasioning his death.

The widow and minor children bring the present action against defendant for damages, and, on the verdict of a jury, recovered a judgment for $5000, from which the defendants appeal.

The grounds of defence, as we understand them, are threefold, viz.:

1st. That Lynch was an independent contractor, and therefore that the relation of master and servant did not exist between defendants and Faren, the employee of Lynch.

2nd. That if Lynch was not an independent contractor, then that he was a fellow servant of Faren, and the injury resulting from Lynch's fault, Faren cannot recover.

3rd. That Faren knew the danger and assumed the risks of the work, and therefore cannot recover.

I.

Both parties quote and accept the exposition of the doctrine of independent contractor given by Wm. Wood in his work on Master and Servant, viz.: "When a person lets out work to another to be done by him, such person to furnish the labor and the contractee reserving no control over the work or workmen, the relation of contractor and contractee exists, and not that of master and servant, and the contractee is not liable for the negligent or improper execution of the work by the contractor." Wood on Master and Servant, p. 593.

This is a sound and conservative principle, but the element essential to the discharge of the contractee from responsibility is that he shall

not reserve control over the work. This does not mean that he may not reserve a certain kind of power of direction as to the thing to be done, provided the method and instruments of doing the thing are left under the exclusive control of the contractor. "The simple test is," says Mr. Wood, " who has the general control over the work? who has the right to direct what shall be done and how to do it? And if the person employed reserves this power to himself, his relation to his employer is independent and he is a contractor; but if it is reserved to the employer or his agents, the relation is that of master and servant." Wood, 614.

In the leading case of Camp vs. the Church Wardens, the contract was for the reconstruction of a cathedral according to certain plans, the contractor agreeing to act " under the direction and superintendence of the architect appointed by the wardens." The court found the injury resulted from defects in the *plan* pursued in prosecuting the work as well as from negligence in the contractor, and held both liable *in solido*, on the ground that the plan or method of prosecuting the work was under the control of the architect. Camp vs. Church Wardens, 7 Am. 322.

In another case before the Supreme Court of the United States, the contract was for the building of a wharf by the contractor for a railway company, and the contract contained the clause: "It is understood and agreed that the said G. W. Bayley, division engineer of the company, shall supervise and direct the work herein agreed to be done, and that the said work shall be done to his said satisfaction." Considering the nature of the work, the court held that this clause operated a reservation of control over the method of conducting it which rendered the company responsible for injury resulting from defect in such method. R. R. Co. vs. Hanning, 15 Wall. 650.

A recent case, perfectly analogous to the instant one, arose before the Supreme Court of Massachusetts, where the contractor entered into a written contract with trustees, by which he agreed " to take down the entire building known as the A. house, or so much theroof as the trustees may request," and which also provided, " All of said work to be done carefully and under the direction and subject to the approval of the trustees." The court held that this reservation of control implied that the contractor " was subject to their orders as to the time and manner and mode of doing the work; that they had the right to step in and say to him, 'you are not doing this as we directed you to do it; we direct you to do thus and so, and we direct you to do this in the other way,'" and that this brought the case within the relation

of master and servant," and rendered the trustees responsible for injuries resulting from the negligence of their employee. Linnehan vs. Rollins, 137 Mass.

In the present case, two things are apparent on the face of the contract, viz. : 1st. That the work referred to in the contract embraced the entire demolition of the internal framing of the building, including removal of braces and purlines. 2d That the entire order, method and plan of this work of demolition was subject to the control of defendants through their agent, the supervising architect, whose directions Lynch was bound to obey under penalty of forfeiting all his rights. The nature of the work was such that nothing else but the *method* of doing it required the supervision of an architect, and we can see no other possible construction of the language employed.

If the architect had directed or permitted Lynch to strip the building as actually done by defendants, before removing the spans, Lynch would have been the servant of defendants *quoad* the adoption of this method, and they would have been responsible for any injury resulting therefrom. *A fortiori* are they responsible when they themselves adopt this method and do this part of the work themselves.

All authorities agree that the immunity of a contractee depends on his entire abstinence from control, and that if he personally interferes in the work and assumes control of it or of some part of it, and through such interference, whether as a direct result or as a consequence thereof, injury results to a servant, he is responsible. 2 Thompson on Neg., p. 913, No. 40; Wood, Mast. and Servant, p. 837; Wharton on Neg. §§ 186, 205; Cooley on Torts, p. 548; Gilbert vs. Beach, 16 N. Y. 608; Hefferman vs. Benkard, 1 Robt. 432.

It is perfectly clear that the stripping of the building by the removal of the purlines and braces was an essential part of the work covered by the contract; that the time, order and manner of their removal formed important elements of the method to be adopted in effecting the demolition ; that the adoption of the particular method here pursued was the direct act of defendants themselves; that it was a vicious, faulty and dangerous method, and if the injury to Faren happened as a direct result or consequence of this fault, defendants cannot shield themselves from responsibility under the doctrine of independent contract.

## II.

The evidence leaves no doubt that the accident to Faren was the consequence of the acts of defendants in stripping and weakening the building. No other cause is assigned for the breaking of the fasten-

ings and the detachment of the purline from its supports, without which it could not have fallen. This detachment resulted from the spreading of the trusses occasioned by the removal of the numerous purlines and braces which held them in position, and by the jarring to which the building had been subjected in this unsafe condition. As to whether this spreading occurred before or after Lynch began work on this particular truss the evidence is conflicting; but it is sufficient to say it could not have occurred at all but for the removal of the other purlines and the strain to which the structure had submitted.

It is claimed, however, that, notwithstanding the fault of defendants, the accident would not have happened but for the fault of Lynch in failing to comply with the stipulation in his contract requiring him " to use all necessary braces, struts, etc., so as to secure the safety of the various parts of the building."

This may or may not be true; but conceding it to be true, this would only serve to impute the accident to the combined faults of defendants and of Lynch, and the effect would be, not to discharge defendants, but merely to make Lynch responsible *in solido* with them. Camp vs. Church Wardens, 7 Ann. 322; Cooley on Torts, p. 548.

If we treat Lynch as a servant and not as an independent contractor, and Faren, as a fellow servant, this would afford no protection to defendants. The doctrine is well settled that "if the negligence of the master had a share in causing the injuries of plaintiff, the master is liable, notwithstanding the contributory negligence of his fellowservant." Grand Trunk vs. Cummings, 106 U. S. 700; Beach on Cont. Neg., § 96; Wharton on Neg., §§ 234, 913; 2 Thomp. Neg., p. 913.

Moreover, under this view of Lynch's relation as a servant, he would be, as to Faren, a vice-principal or direct representative of the master, to whom Faren would owe the same obedience as to the master himself, and for whose negligence the master would be responsible as for his own. Chicago, etc., R. R. Co. vs. Ross, 112 U. S. Sec. 377; Towns vs R. R. Co., 37 Ann. 632; Wood on Master and Servant, p. 865.

### III.

The final contention of the defense is that Faren knew the danger, and assumed the risk of the work in which he was engaged.

Without discussing the nice distinctions underlying the application of the principle referred to, it is sufficient to say that the servant is only bound to see patent defects, not latent ones; that mere knowledge of defects will not bar his recovery unless accompanied by knowledge

that the defects are dangerous, and that he has a right to rely upon the care and superior knowledge and judgment of his employer, and to act upon the assumption that the latter would not expose him to unnecessary risk, and has taken all proper precautions to guard him from danger. Wood, Master and Servant, pp. 681, 738-9, 763; 2 Thompson, Neg., p. 975; Wharton, Neg., § 215.

Here the defect which occasioned the injury, viz: the disengagement of the purline, was latent and, of course, entirely unknown to Faren, as otherwise he would not have trusted his weight upon it. It was the result of the vicious and faulty method of demolition adopted by defendants, the more faulty because they dispensed with the supervising architect required by their contract, whose better judgment would, doubtless, have prevented such imprudence. At all events, they created the danger, and were under the highest obligation to guard against it. They admit that they did not know or believe that there was danger. How can they require of Faren more knowledge or better judgment than their own? He, on the contrary, had the right to rely on their superior knowledge and judgment. He had been engaged on this work from the beginning. Notwithstanding the stripping, a very large number of the trusses had been lowered without accident. He was not bound to anticipate that this particular purline was disengaged, or held to assume the risk of such a peril.

The principle invoked by defendants has no application to this case, and as the injury happened by their fault, they must respond for the damages.

The verdict of the jury was unanimous as to defendants' liability, one juror stating that he disagreed as to amount of damages allowed, without stating whether he thought they should be greater or less. The jury acted under a charge of the judge, unusually full and clear, and certainly as favorable to defendants as the law would justify. The judge, in overruling the motion for new trial, announced his conclusion that the law and the evidence were in favor of plaintiff.

After a painstaking study of the record, we agree with him.

Judgment affirmed.

Poché, J. takes no part in this opinion and decree, having not heard the argument of the case.