## GATTIS G. BEAL v. CHAMPION FIBER COMPANY ET AL.

(Filed 20 December, 1910.)

1. Contracts—Independent Contractor—Requisites—Respondeat Superior.

One of the vital elements in the relation of independent contractor is that the person for whom the work is contemplated to be done is interested only in the ultimate result of the work; and when it appears that the owner, under the contract relied on to establish this relationship and avoid responsibility for the contractor's negligent acts, furnished important portions of the material for constructing the appliances and the facilities for carrying on the work; that all purchases and prices of materials and supplies were subject to the approval of the architect or superintendent employed and paid by the owners, and that they had the right to select, control, and discharge the labor employed and fix the price of their pay, the facts are insufficient to establish the relationship of independent contractor, and the doctrine of *respondeat superior* applies.

2. Master and Servant—Vice Principals—Tests.

The right of an employee to hire and discharge other servants is not the sole test of this relationship to the master as vice principal, for the principle also obtains when one in charge of other servants is so empowered that the others have just reason for believing that neglect or disobedience of his orders will be followed by their dismissal.

3. Contracts—Independent Contractor—Evidence.

In this action, it appearing that there was sufficient evidence for a finding by the jury for plaintiff upon issues as to whether the servant, whose negligent orders caused the injury, was a vice principal, a motion for judgment as of nonsuit upon the evidence upon that ground was properly denied.

4. Contracts—Independent Contractor—Negligence—Evidence.

The servant alleging damages in his action against the master as proximately caused by a negligent order of the latter's vice principal, given while erecting a three-story building, there was evidence tending to show: that the servants were engaged in hoisting heavy timbers, and that the usual way to hoist one of them was to place it beneath a "crab" and hoist on a perpendicular; that on the occasion of the injury the rope was fastened to a timber some distance off, giving it a slant and throwing the line beneath and against a rafter which had just before been

raised and which rested on the beam where the timbers were to be placed; that in the performance of his duties the plaintiff was standing near the end of this timber preparing to throw the tag rope to a fellow-servant to draw the rafter to its proper place, when the vice principal, without notice or warning, ordered the men at the "crab" to operate it, causing a "crab" rope beneath the timber near which the plaintiff was standing to knock it or pull it off the plate, from which it fell, to the plaintiff's injury; that the plaintiff was not in a position to see or know what was going on, and had no reason to believe the hoist would be ordered at that unusual time: *Held,* sufficient upon the question of negligence.

**5. Contracts—Independent Contractor—Negligence—Unexpected Results.**

When in the hoisting of heavy timbers in the erection of a building a negligent order of a vice principal causes an injury to a servant engaged in the work, without fault on the part of the servant, and it appears that the vice principal knew or should have known that the order would be likely to produce an injury to some of the employees, though the vice principal was not in position to see the servant at the time, the master is not excused from liability for the injury because the result was not exactly what might have been expected.

APPEAL from *Councill, J.,* at September Term, 1910, of BUN-COMBE.

The evidence tended to show that 25 February, 1907, plaintiff, an employee, was engaged with others in putting up a lot of buildings for defendant company at Canton, N. C., the particular building in question being the third floor and roof of the "Extract Building," and while so engaged he received serious injuries by reason of the negligent orders given by one Sam Clayton, a foreman who had immediate charge of this particular work they were doing at the time. On the trial the jury rendered the following verdict:

1. Was the plaintiff, at the time of the injuries complained of, in the employ of the defendant Champion Fiber Company? Answer: Yes.

2. Was the plaintiff injured by the negligence of the defendant Champion Fiber Company, as alleged in the complaint? Answer: Yes.

3. Was the plaintiff guilty of contributory negligence? Answer: No.

4. Was the plaintiff damaged by the negligence of the defendant Champion Fiber Company, and if so, in what amount? Answer: $1,000.

Judgment on the verdict, and defendant excepted and appealed.

*James J. Britt and J. F. Ford for plaintiff.*
*A. S. Barnard for defendant.*

HOKE, J.  The validity of this trial and judgment is challenged by defendant chiefly on three grounds: (1) That Sam Clayton, whose negligent order is said to have caused the injury, was an employee of one Frank Gilreath, an independent contractor, and for that reason no responsibility for Clayton's acts were properly imputable to defendant. (2) For that said Sam Clayton was in no sense a vice principal of defendant company, but only an ordinary boss of a gang of hands, constituting him a fellow-servant of plaintiff. (3) That on the facts in evidence there was no negligence shown, either on the part of Clayton or any one else, for whose conduct defendant company was responsible. But we are of opinion that none of these positions can be sustained.

As to the first position, in Cooley on Torts, marginal page 646, an independent contractor is defined as follows: "Where the contract is for something that may be done and is proper in its terms, and there has been no negligence in selecting a suitable person to contract with in respect to it, and no general control reserved either as respects the manner of doing the work or the agents to be employed in doing it, and the person for whom the work is to be done is interested only in the ultimate result of the work, and not in the several steps as it progresses, the latter is neither liable to third persons for the negligence of the contractor as his master, nor is he master of the person employed by the contractor so as to be responsible to third persons for his negligence."  The author cites in support of this position Shearman and Redfield on Negligence, sec. 165, and in which the term is thus referred to: "One who con-

tracts to do a specific piece of work, furnishing his own assist-
ants, and executing the work either entirely in accordance with
his own ideas or in accordance with a plan previously given to
him by the person for whom the work is done, without being
subject to the orders of the latter in respect to the details of
the work, is clearly a contractor and not a servant." In a re-
cent work on this special subject, Moll on Independent Con-
tractors and Employers' Liability, secs. 16, 17, 18 *et seq.*, simi-
lar definitions from courts of recognized authority are given,
thus: "An independent contractor has also been defined to be
one who, exercising an independent employment, contracts to
do a piece of work according to his own methods and without
being subject to the control of his employer, except as to the
result of his work." *Lurton, J., in Powell v. Construction Co.,*
88 Tenn., 692. Again, "The test to be applied is whether the
employee represents the employer as to the result of the work
or as regards the means. If the former, he is to be regarded as
an independent contractor, but if the latter, merely an agent
or servant." *Parrott v. R. R.,* 127 Ia., 419. And, "The test
generally applied in answering the question who are independ-
ent contractors is, Independence of control in employing work-
men and in selecting the means of doing the work." The
author, section 19, then quotes with approval from Judge
Thompson's Commentaries on Negligence. "If the proprietor
retains for himself or for his agent (*e. g.,* architect and superin-
tendent) a general control over the work, not only with refer-
ence to results, but also with reference to methods of procedure,
then the contractor is deemed the mere agent or servant of
the proprietor, and the rule of *respondeat superior* operates to
make the proprietor liable for his wrongful acts or those of his
servants, whether the proprietor directly interfered with the
work and authorized and commanded the doing of such acts or
not. It is not necessary, in such a case, that the employer
should actually guide and control the contractor. It is enough
that the contract vests him with the right of guidance and
control." The principle is very clearly expressed in a Pennsyl-
vania case, *Smith v. Simmons,* 103 Pa., 32: "Where one who
contracts to perform a lawful service for another is independ-

ent of his employer in all that pertains to the execution of the work, and is subordinate only in effecting a result in accordance with the employer's design, he is an independent contractor, and in such case the contractor alone and not the employer is liable for damages caused by the contractor's negligence in the execution of the work"; and a like ruling was made in *Faren v. Sellars,* 39 La. Ann., 1011, on facts not dissimilar to these presented here. These definitions have been recognized as sound and upheld in numerous decisions of our own Court. *Thomas v. Lumber Co.,* 153 N. C., 351; *Hunter v. R. R.,* 152 N. C., 682; *Gay v. R. R.,* 148 N. C., 337; *Young v. Lumber Co.,* 147 N. C., 26; *Davis v. Summerfield,* 133 N. C., 325; *Craft v. Lumber Co.,* 132 N. C., 151; *Waters v. Lumber Co.,* 115 N. C., 648. And their correct application to the facts presented are against defendant's first position, as above stated. It appears in evidence that defendant company, engaged in constructing, at Canton, N. C., an extensive plant, to include numerous buildings, for the manufacturing of pulp and tannic acid, on 19 March, 1906, entered into an agreement with Frank B. Gilreath, of the city of New York, to do the work contemplated. True, he is "hereinafter designated as contractor," and, as a general proposition, no doubt he was; but from a perusal of the contract entered into between the parties and in view of the authority and control reserved therein to the company "hereinafter designated as owner," it is manifest in reference to this particular work that the position of independent contractor on the part of Gilreath cannot be maintained. The contract in question, after the usual preliminary statements, provides generally that the work shall be done as outlined on drawings prepared by George F. Hardy, mill architect, and called drawing No. 8613, general plan of mill buildings, "and that said work is to be done under the supervision of this architect and subject to his approval, and he is to be paid by the owner."

Article 3 of the contract is as follows: "The architect will be represented at the work by a civil engineer, who is referred to in this contract as the engineer, and who will have the power which this agreement gives him, subject to the approval of the architect. No alterations shall be made in the work except

upon the written order of the architect or engineer. The contractor shall provide sufficient safe and proper facilities at all times for the inspection or laying out of the work by the architect or engineer and shall follow his directions regarding the manner in which the work shall be carried out."

In article 14 it is stipulated: "Should the contractor at any time refuse or neglect to supply a sufficiency of properly skilled workmen or of materials of the proper quality, or fail in any respect to prosecute the work with promptness and diligence, or fail in the performance of any of the agreements herein contained, such refusal, neglect, or failure being certified to by the architect as sufficient ground for such action, the owner shall be at liberty after seven (7) days' written notice to the contractor to terminate the employment of the contractor for the said work and enter upon the premises and take possession, for the purpose of completing the work included under this contract, of all materials, tools, and appliances thereon and to provide the materials therefor." .And further: "The contractor is to furnish and maintain in proper working condition all appliances required on the job, such as engines, pile drivers, derricks, concrete mixers, stone crushers, gravel screens, or in fact any other machinery or plant that may be necessary to enable the work to be done as expeditiously and economically as possible. The owner is to furnish labor to operate the plant, but the contractor is to keep it in repair." And again, same article: "The word 'plant' which the contractor is to furnish and maintain is understood to cover and include all perishable tools, such as picks, shovels, hose, wheelbarrows, structures for crushers and mixing plant, wire falls and hemp rope and piping or fittings; but the owner furnishes all lumber for scaffolds, runways, temporary buildings on the job, except for commissary or lodging purposes, and scaffolds, except contractors' patent scaffold horses."

Articles 5, 6, 7, 8 of the contract are as follows: "The contractor is to carry liability and fire insurance to the extent approved by the owner, and the actual cost of the same is to be borne by the owner. If it shall be necessary for the contractor to pay the traveling expenses of workmen or foremen to obtain

them in order to prosecute the work to the satisfaction of the owner, such traveling expenses shall be borne by the owner. It is understood that the contractor shall do all scheduling of materials and obtain all proposals. These proposals to be submitted to the owner and the final purchasing to be done by the contractor or by the owner at the option of the owner, but in any case the owner is to pay the contractor his percentage of profit, which is to be reckoned on their actual cost.

"Article 6. None of the work included in this contract is to be sublet without the approval of the owner.

"Article 7. All bills for purchases are to be rendered in the name of the Champion Fiber Company and are to be paid for by them, and the contractor agrees that all rebates and commissions on purchases shall be credited to the owner.

"Article 8. The labor is to be engaged and be under the control of the contractor, but the owner reserves the privilege of furnishing labor to contractor or discharging men in the employ of the contractor at any time and only on notice to the contractor's foreman in charge at the work. The wages paid to foremen and labor shall be subject to the approval of the owner, who must be consulted as to wages in each class of labor before the employment of same. All payment of wages to be made by the owner, and timekeepers are to be appointed by him."

From these extracts, disclosing as they do that the agreement reserves to the company the right to direct "the manner in which the work shall be carried out," that the company is to furnish important portions of the material for constructing the appliances and facilities for carrying on the work, that all purchases and prices of materials and supplies are subject to the "owner's" approval, and reserving further the right to select, control, and discharge the labor employed and fix the prices paid the same, it sufficiently appears that, while the party of the first part is termed a contractor in the agreement, he can in no sense be considered an independent contractor, but is little more than a general overseer, selected, no doubt, by reason of his capacity and experience, but in fact and in truth himself an employee and servant of the company and rendering the company responsible for negligence committed in doing the work

under the general principles of the law of negligence applicable in such cases. To show how complete the work of the laborers employed in it were under the control of the company, on one occasion when some of these employees sent up a request to James F. Powers, superintendent for Gilreath, for shorter hours, etc., in the estimate of the day's work, Powers answered the petition as follows:

UNITED BROTHERHOOD OF CARPENTERS AND JOINERS
    OF AMERICA,       *Canton, N. C.*

GENTLEMEN:—We have handed your letter of the 7th inst. over to the Champion Fiber Company, and up to this hour have not received a reply. We therefore cannot make any statement regarding the matter referred to in your letter.

Yours truly,
FRANK B. GILREATH,
*By* JAMES F. POWERS, *Superintendent.*

And later, the company made reply to the petition as follows:

CANTON LOCAL UNION, No. 1806, UNITED BROTHERHOOD OF
    CARPENTERS AND JOINERS OF AMERICA.

GENTLEMEN:—Answering your communication addressed to Mr. James F. Powers, superintendent, we have the following offer to make for your consideration: It is desirable to keep the job running ten hours; we will, however, call your day, for the first five days in the week, nine hours, paying you time and one-half for the tenth hour; on Saturday we will call your day eight hours and pay you time and one-half for overtime. The old rate per day to be basis for day's work. Regarding the matter of paying you during the hours of 1 o'clock and quitting time, we see no objection to this, and agree to see that this is done. If this scale is adopted, it is with the understanding on our part that it is to be in force through the construction of the mill buildings.

Awaiting your reply, we are,    Very truly,
THE CHAMPION FIBER COMPANY,
CHARLES S. BRYANT, *Secy. and Treas.*

As to the second position, and under our authorities on the subject, there was evidence tending to show that Sam Clayton, the foreman in immediate charge of the work, was a vice principal. While under some of our former decisions there was intimation if not decision that the power to hire and discharge employees was the test by which this relationship was to be determined, it soon came to be understood and has been repeatedly held with us that the power indicated was only evidential on the question, and the true test is as laid down in *Turner v. Lumber Co.,* 119 N. C., 387, as follows: "The test of the question whether one in charge of other servants is to be regarded as a fellow-servant or vice principal is whether those who act under his orders have just reason for believing that neglect or disobedience of orders will be followed by dismissal," a ruling that has been since approved in numerous cases with us. *Hipp v. Fiber Co.,* 152 N. C., 745; *Lamb v. Littman,* 132 N. C., 978; *Mason v. R. R.,* 111 N. C., 482.

From the facts in evidence it appeared that quite a number of employees were engaged in raising a lot of heavy timbers 8 x 10 and 10 x 12 and 18 and 36 feet in length from the ground floor to the roof of a three-storied building through a space on the second floor of something like 18 feet square. The hoisting was done by means of a crab or powerful windlass, and some of the men were on the ground floor, others on the second floor to assist in guiding, and yet others were at the roof or the plate or beams on which it was to rest, the plaintiff being with this last squad. There was a main or crab line which was fastened to the timber below, piece by piece, and there were guide and tag lines to direct the timber in the ascent and place it when same had been raised to its proper height. It was evidently a work of importance and some magnitude, and dangerous unless coolly and skillfully supervised and directed. One witness testified that he had applied for a transfer from the work on account of the danger attending it. There were quite a number of men engaged in the work, and Sam Clayton, the foreman, whose order, it was claimed, caused the injury, had the entire charge of the work, at the time, and the control and direction of the men who were engaged in it.

Speaking to the question of Clayton's authority, one witness, William B. Turner, stated that he had a conversation with Mr. Powers, the superintendent, with reference to Clayton's ability to *oversee the job,* and further, "That Clayton had power to discharge men, so far as witness knew, but he had never seen him discharge any." Another witness, L. H. Gillespie, testified: "That Clayton had the right to send men to Powers. I remember one man that was sent to Powers and Powers discharged him. This is the only one I remember. Clayton recommended his discharge." Plaintiff, himself, testified: "I know that Clayton could tell men that if they did not do a certain thing they could go to the office to get their time. Clayton gave orders from time to time. If I had disobeyed his orders, he would have sent me to the office and I would have been fired or discharged." This is testimony from which the authority of Clayton, as vice principal, might be inferred, and is of itself sufficient to justify the refusal of the court to charge, as requested, that in no event could said Clayton's negligence be imputed to defendant company, and to nonsuit plaintiff for that reason. And there is ample testimony from which negligence on the part of Clayton could be properly established.

The evidence tended to show that the usual way to hoist one of these timbers was to place it just beneath the crab and hoist on a perpendicular, but on this occasion the rope was fastened to a timber some distance off, and giving it a slant and throwing the line beneath and against a rafter, which had just before been raised and rested on the beam. That plaintiff was standing near the end of this timber preparing to throw the tag rope, as his duty was, to the men who were to draw the rafter to its proper place, when the foreman, Sam Clayton, without any warning or notice and before plaintiff had time to do the work he was given to do, gave the men at the crab orders to go ahead. They turned the windlass, the crab rope beneath the timber near which plaintiff was standing knocked it or pulled it off the plate, and it fell, caught in the rope which plaintiff was handling, wrapped around his leg and dragged him to the concrete floor, causing the injury complained of. The plaintiff was not in a position to see what they were doing below, and

BEAL v. FIBER CO.

he testifies that he did not know and had no reason to think that a hoist would be ordered at the time, as the custom had been to place the timbers just under the crab, carrying them there with a "dolly." True, Clayton was not in a position to see plaintiff, but he knew or should have known that an order to hoist with the crab rope at a slant and touching the piece of loose timber would likely knock it off the beam, and that injury to some one would likely follow. And in such case a company responsible for his acts would not be excused because it didn't happen in the exact way that it might have been expected. *Hudson v. R. R.,* 142 N. C., 198; *Drum v. Miller,* 135 N. C., 204.

There was some evidence to the effect that Clayton had the reputation of being a drinking man, and the character of the order and the tone and language of it would seem to indicate it. One witness said: "If the men did not get around fast enough he would holler at them and tell them to get in a hurry, and he scared them at the crab and they would jerk it around." And another witness, speaking to this very order, said: "I had hold of the crab. I heard some one give orders. The words were pretty rough; he said, 'Pull up there! God damn it! Pull up there!'" And it was a serious hurt. Speaking to the injury, plaintiff said: "I fell straight down. Broke my left thigh, broke both wrists, broke my jawbone in the center, dislocating and breaking my upper jawbone, starting at my nose, clear over. I lost three teeth. By my arm being broken I cannot turn it over to do my work, that is my right arm. I cannot turn my wrist at all. I was in the hospital seven weeks and it was six or seven months before I could walk any. I have never recovered so that I can do my usual manual labor. I am unable to work at my trade as a carpenter because I cannot drive a nail above my head. I suffer pain every morning from my ankle, and it is so weak I cannot walk without a shoe. My wrist is sore and it hurts me to work."

On the question of negligence, the facts in evidence bring the case within the principle of *Hipp v. Fiber Co., supra,* and *Wade v. Contracting Co.,* 149 N. C., 177, and there is no error which gives defendant any just ground of complaint. The judgment will therefore be affirmed.

No error.