## J. B. McCRARY ENGINEERING CO. et al. v. WHITE COAL POWER CO. et al.

Circuit Court of Appeals, Fourth Circuit.
October 15, 1929.

No. 2853.

J. G. Merrimon, of Asheville, N. C. (Merrimon, Adams & Adams, of Asheville, N. C., on the brief), for appellant J. B. McCrary Engineering Co.

A. Hall Johnston, of Asheville, N. C. (R. E. Finch, of Black Mountain, N. C., on the brief), for appellant Town of Black Mountain.

Joseph F. Ford and Frank Carter, both of Asheville, N. C. (Lee, Ford & Coxe, of Asheville, N. C., and Carter & Carter, of Mt. Airy, N. C., on the brief), for appellees.

Before PARKER, Circuit Judge, and SOPER and HAYES, District Judges.

HAYES, District Judge. J. B. McCrary Engineering Company, pursuant to a contract with the town of Black Mountain, N. C., was engaged in erecting a concrete dam for it on its premises in Dunsmore Cove, for the purpose of supplying the town with water for its inhabitants, as well as citizens outside the corporate limits. The town charges its customers for the water. The premises of the town had been thoroughly cleaned off by the engineering company and the pouring of concrete for the dam was in progress. It used a small concrete mixer, the power for which was supplied by a steam boiler designed for using coal, but, in fact, wood was used for fuel on this occasion. The dam site was in the Dunsmore mountain cove of the Blue Ridge range, surrounded by the usual forests, rhododendron, brush, and rubbish. It was a dry season, and the wind was blowing toward adjacent property covered with highly inflammable matter. Under these conditions the concrete mixer was stationed within 20 to 30 feet of the adjacent wooded land. Its boiler was equipped with a nine-foot smokestack, which had on it a conical covering described by some of the witnesses as a spark arrester, by others as a device regulating the draft for the fire and the boiler. There was conflicting evidence as to the adequacy of the device to deflect escaping sparks. Sufficient evidence was introduced to carry the case to the jury on sparks escaping from the smokestack on that day, and the ignition of the leaves on the adjacent property within 20 to 30 feet of the boiler, under such circumstances as to warrant the legitimate inference that the escaping spark from the boiler set fire to the forest, and that the proximate cause of the fire was the negligent failure to properly equip the boiler with a spark arrester, and to clean off the leaves and inflammable matter for a reasonable distance from the boiler.

The fire spread rapidly and raged through the mountains for two days, during which the lands of the plaintiffs below were burned over, causing substantial damage. The topography of the earth in that vicinity was rough, high ridges divided by valleys and coves, but the fire spread in the same general eastward direction from the boiler and covered lands in Buncombe and McDowell counties. There was evidence, if accepted by the jury, to show there were probably other fires in the mountains of different origin, but it was conflicting, and there was sufficient sustantial evidence that the injury complained of was caused by the fire originating from the boiler. From a judgment in favor of the plaintiffs below, the defendants below appeal; the engineering company urging chiefly that the court erred in its refusal to nonsuit the plaintiffs at the close of their evidence, the refusal to grant the motion at the close of all the evidence, and the refusal to direct a verdict for defendants, all of which may be considered together. The error, if any, of the court in refusing the motion of nonsuit at the close of plaintiffs' evidence, is unavailing, where defendant introduces evidence. On appeal, the court must consider the entire evidence on the question of its legal sufficiency to carry the issues joined to the jury, but the appellate court cannot consider the lack of substantial evidence for a determination of the jury in such a case, unless there is a renewal of the motion to nonsuit at the close of all the evidence or a request for a directed verdict. Sigafus v. Porter, 179 U. S. 116, 21 S. Ct. 34, 45 L. Ed. 113; Atlantic Coast Line R. Co. v. Connor (C. C. A.) 194 F. 409; Cole Mfg. Co. v. Mendenhall (C. C. A.) 240 F. 641. Under the practice in North Carolina, where the motion of nonsuit is granted, plaintiff may again prosecute his action within one year. Under the federal practice, a directed verdict is a final determination of the litigation. But the motion to nonsuit and the request for a directed verdict challenge

the legal sufficiency of substantial evidence to support a verdict. For these reasons, we have set forth the substance of the evidence, which is, in our opinion, sufficient to support the verdict.

We cannot adhere to the proposition that the owner is not liable for injury caused by escaping sparks from a smokestack equipped with a spark arrester, if he does not permit his premises to become foul. The principle is sound if the smokestack is removed far enough from adjacent property under all the surrounding conditions as will likely prevent injury to adjacent property. The principle relied on by the engineering company, stated in Williams v. Railroad Co., 140 N. C. 623, 53 S. E. 448, was enunciated with respect to assumed conditions with respect to railroads. It was there assumed that the track is in the center of the right of way, which extends 50 feet on either side from the center line. With this assumption, it may not be unreasonable to hold that due care is exercised if the fire escapes from an engine in proper condition, having a proper spark arrester, operated in a careful way, by a competent engineer, and that there is no liability if the fire catches off of the property of defendant. How can this principle be applied to a portable boiler with a 9-foot smokestack, which may be placed 100 feet from the property line, or, as was done in this case, within 20 to 30 feet of the line? Suppose the engineering company had placed the boiler within 5 feet of the inflammable matter, and an escaping spark had set fire to it, though off of the owner's property: It is futile to contend that in such case the owner had discharged, under the circumstances, that degree of care required of the reasonably prudent man. It is the duty of the owner to exercise ordinary care to prevent injury to the property of another by the use of his own.

After a careful consideration of the authorities and the argument of the able counsel in the well-prepared brief of the engineering company, we hold there was sufficient substantial evidence to present a jury question on the negligence of the defendant for failure to provide an adequate spark arrester, and failure to remove inflammable matter for a reasonable space from the boiler. See Milwaukee & St. P. R. Co. v. Kellogg, 94 U. S. 469, 24 L. Ed. 256; Kornegay v. Railroad, 154 N. C. 389, 70 S. E. 731; Aman v. Lumber Co., 160 N. C. 369, 75 S. E. 931.

Exceptions are taken to the refusal to give certain instructions with respect to whether there was a presumption of negligence or not from the fact of a fire and in respect to intervening fires. The learned judge told the jury:

"Before the jury could answer the first and third issues in favor of the plaintiffs, even if there were negligence, the jury must find that the negligence was the proximate cause of the injury which the plaintiffs sustained, that is, the efficient, real cause without which the damage would not have occurred, and unless they so find, then it would be the duty of the jury to answer the first and third issues 'No.'

"The term 'proximate cause' means there must be no other capable agency intervening between the defendants' negligence and the injury; it is not enough to show that the plaintiffs sustained injury under circumstances which may lead to suspicion, or a fair inference that there may have been negligence, but the plaintiffs must show more than a possible liability of the defendants for the injury.

"In order for the plaintiffs to recover in this case they must show, by the greater weight of the evidence, that the injury was caused by the negligence of the defendants, as alleged in the complaint, and by competent proof that the fire occurred by reason of some negligent act and conduct on the part of the defendants, and that it was caused by a spark which came from the boiler of defendants, and it would not be sufficient to show that a fire occurred on their premises, but the plaintiffs are required to show how the fire originated, and the damages that were caused, and circumstances which can only create a suspicion as to how the fire occurred would not be sufficient to warrant the jury in answering the first and third issues 'Yes.' "

The engineering company has no just ground to complain of the instructions to the jury, and we find no prejudicial error in the record entitling it to a new trial.

The town of Black Mountain insists that the engineering company was an independent contractor, for whose negligence it is not responsible, and also urges that its work of constructing a dam for the purpose of supplying water to its inhabitants was the exercise of a governmental function, releasing the municipality from liability. A determination of the first proposition, if decided in favor of the town of Black Mountain, will render unnecessary a consideration of the other points stressed by it.

The plaintiffs attached to and made a part of their complaints the contract entered into between the defendants, the execution of which was admitted by the de-

fendants; the engineering company admitted that it was the agent and servant of the town of Black Mountain, but the town denied that relationship, and insisted that the contract made the engineering company an independent contractor. The contract itself is difficult to construe, unaided by extrinsic facts. It is lengthy, and only the pertinent paragraphs will be quoted (the numerals given the quoted paragraphs are ours):

"(1) Whereas engineers have made surveys, plans, specifications, and estimates of cost of certain water works, improvements, and extensions in and for the town of Black Mountain which have been approved and accepted by clients and identified by the signatures of H. W. Loving and J. Kinsey, and clients being desirous of beginning immediately the construction of said improvements and of engaging the services of the engineers for full and complete engineering and construction management as its agent in expediting the building of said improvements according to said plans, specifications and estimates and the engineers consenting thereto.

"(2) Engineers will immediately prepare lists of the material required in the construction of said improvements according to said plans and specifications and will send said lists together with the proper specifications to various dealers and manufacturers who may be interested therein, inviting bids and specifications.

"(3) After quotations and bids have been received and approved by clients, engineers will place all orders for materials or machinery to the best advantage and will furnish clients tabulation of quotations and bids received and copies of orders placed.

"(4) As soon as sufficient materials and machinery shall have been received in Black Mountain and sufficient common labor secured by the engineers for the economical execution of the work, the engineers will furnish, at actual cost, all skilled men necessary to handle the work and will proceed at once to direct and supervise the proper construction and building of said improvements, according to said plans, specifications and estimates in a first-class workmanlike manner.

"(5) Engineers will furnish at their own expense all hand tools and equipment for the proper and efficient construction of said improvements, clients paying freight on tools and equipment to Black Mountain and their ordinary actual upkeep while on the job.

"(6) Engineers through their engineering construction, cost keeping and accounting departments will properly schedule the work to be done and keep in close touch with the work as it progresses, keeping record of cost of all work done, and once a month furnish clients a report showing condition and cost of job to date.

"(7) Engineers guarantee that the total cost of the improvements including their fee, shown by estimates hereto attached, identified as Exhibit A, constructed in accordance with the aforesaid plans and specifications, identified as Exhibits B and C, shall not exceed the sum of $43,163.00. * * *

"(8) All bills for materials, machinery, labor, freights and other items chargeable to the job shall be paid promptly by the clients as they become due, in order to take advantage of trade and cash discounts, after having been audited by the engineers and approved by both parties.

"(9) Payments for labor shall be made by clients only upon certified pay-rolls which generally will be prepared weekly by engineers giving name, number, time, rate, and amount due each laborer or employee on the work. When the work is completed, engineers will furnish clients a vouchered audit showing complete receipts and disbursements and the complete cost of the work done.

"(10) For and in consideration of the use of tools and equipment and the services to be performed by the engineers and their organization, whereby clients receive the benefit of the engineers business system, purchasing facilities, engineering skill, experience and ability to equip the job with skilled men and laborers and to supervise the work of this character under a guaranteed estimate of cost, the clients agree to pay the engineers a total fee of fifteen per cent. (15%) of the guaranteed estimate cost of the completed improvements. * * *

"(11) Engineers guarantee the work to be free from defects in material and workmanship for a period of twelve months after final acceptance. Should any defects occur they shall be repaired by engineers, the cost of repairing to be charged against the cost of construction. If the initial cost plus cost of repairing, if any, exceeds the guaranteed estimate the engineers agree to pay such difference.

"(12) It is mutually agreed and understood between the parties hereto that this contract is a cooperative agreement, wherein both parties hereto bind themselves to do everything reasonable to facilitate the carrying out of its terms and conditions to se-

cure economy of construction as well as time of completion."

The contract clearly contemplates the payment of costs of construction plus 15 per cent. fee to the contractor. Such a contract is not inconsistent with the relationship of an independent contractor to his owner. See Drake v. Asheville, 194 N. C. 6, 138 S. E. 343; Foundation Co. v. Henderson (C. C. A.) 264 F. 483. The clauses of the contract upon which the plaintiffs below principally rely to prove that the relationship was one of master and servant, or principal and agent, and not that of independent contractor, are Nos. 1, 3, 8, and 12. The contract construed in Drake v. Asheville, supra, is substantially the same as the contract in this case, with the exceptions of paragraphs (1) and (12). It is our duty to consider the instrument from "its four corners" and not from an isolated paragraph, and to declare the intention of the parties from the language employed in the entire instrument, regardless of the classification of the parties as determined by themselves. Young v. Lumber Co., 147 N. C. 26, 60 S. E. 654, 16 L. R. A. (N. S.) 255. A careful consideration of the instrument reveals the outstanding fact that the engineering company is to place the orders for materials, to select the laborers, furnish skilled labor, and direct and supervise the building of the desired improvements "according to said plans, specifications and estimates in a first-class workmanlike manner."

The town reserved no authority over the details of the work, nor of the manner of its performance, and its interest was principally in the result. It is true its approval is essential to the purchase of materials to be used in the improvements; but this cause of action does not arise out of defect of materials, and that feature of the contract may be eliminated for the purposes of this decision. The municipality is not authorized to employ or discharge labor, skilled or unskilled, nor to direct or supervise the construction. In clause 11 the contractor guarantees the work to be free from defects in materials and workmanship and agrees that, if the initial cost plus the cost of repairs exceeds the guaranteed estimate, the engineers will pay such difference. Against these clauses, bearing all the earmarks of an independent contractor, are arraigned clauses 1 and 12. These two clauses are not necessarily inconsistent with the construction of a contract creating the relationship of an independent contractor. The twelfth clause is a mutual undertaking by both parties to get the job completed as economically as possible, and nothing in it necessarily contravenes the interpretation of the contract as one creating the relationship of owner and independent contractor. Clause 1, if standing alone, would lend support to the position that the engineering company was an agent of the town, and not an independent contractor; but we must construe that clause, not alone, but in connection with the other provisions of the contract, bearing in mind that it is not the names which the contract uses, but the provisions which it makes for control over the details of the work, by which the status of the engineering company is to be determined. When the contract is construed as a whole, with this criterion in mind, there can be no doubt, we think, that the engineering company occupied the position of an independent contractor.

In New Orleans Mobile & C. R. Co. v. Hanning, 15 Wall. 649, 21 L. Ed. 220, the court construed a contract somewhat similar to this. In that case, the contract contained a provision that Bailey, the engineer of the company, who contracted on its behalf, "shall supervise and direct the work hereby agreed to be done and that the said work shall be done to his satisfaction." While the contractor there agreed to furnish the materials and labor and to do the work, he was held not to be an independent contractor, because the company's engineer had the authority to supervise and direct the work to be done. But for that provision the contract there would have been interpreted as one of an independent contractor. This early case adopts the test of liability between the principal and contractor to a third party to be whether the principal, not only directed what was to be done, but how it should be done.

In Standard Oil Co. v. Anderson, 212 U. S. 215, 29 S. Ct. 252, 254, 53 L. Ed. 480, slightly different language is employed to determine the question of an independent contractor. The court says: "To determine whether a given case falls within the one class or the other we must inquire whose is the work being performed, a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work." These tests are recognized and applied by the Supreme Court of North Carolina. See Drake v. Asheville, supra, and the authorities cited therein. The case of Beal v. Champion Fiber Co., 154 N. C. 147, 69 S. E. 834, when properly construed, adopts the same test, and certainly is not inconsistent with the inter-

pretation in the Drake Case, or with any case cited that was decided by the federal courts.

■ This construction that the engineering company is an independent contractor relieves the municipality from the negligent acts of the engineering company, unless the injury comes within one of the several recognized exceptions to the general rule. It is not contended by the plaintiffs below that this case comes within the exceptions, but the engineering company calls our attention to the case of Roper Lumber Co. v. Hewitt (C. C. A.) 287 F. 120, and insists that, if there is any liability at all, the municipality cannot escape liability on account of the engineering company's being an independent contractor.

We do not think the injury in this case was one directly resulting from a nuisance, or the doing of a work necessarily fraught with danger to others. It is to be borne in mind that the fire did not escape from cleaning off the lands and burning the débris, which might or might not under given circumstances become highly dangerous, and make the owner responsible, notwithstanding the interposition of an independent contractor. But the injury here, if occasioned at all by the negligence of either defendant, was caused by the escape of sparks from a 9-foot smokestack, not equipped with an adequate spark arrester, and by the placing of the boiler within 20 feet of highly inflammable material, when the same was dry, and when the wind was blowing in the direction of the material from the boiler. In other words, the injury here resulted, not from the doing of a highly dangerous work required by the owner, but it was rendered dangerous by the details of the work adopted solely by the independent contractor, and over which the municipality had no control.

While recognizing and approving the principle enunciated in Weinman v. De Palma, 232 U. S. 571, 34 S. Ct. 370, 58 L. Ed. 733, that the doctrine which relieves the owner from liability for the negligence of an independent contractor does not apply where the work that the contractor is to do of itself amounts to a nuisance, or necessarily operates to injure or destroy the property of a third person, we are of the opinion that the facts in this case do not come within this principle, and that the owner is relieved from liability. It is not necessary for a determination of this case for us to decide on the liability of the municipality, if the fire had escaped from the burning off of its land through the negligence of its con-tractor, as we find that the fire was collateral to the main undertaking, and resulted from the doing of a detail of the work under the direction and supervision of the independent contractor.

Finding no error in the appeal of the J. B. McCrary Engineering Company, of Atlanta, Ga., the judgment of the court below as to it is affirmed; but the judgment as to the town of Black Mountain is, for the reasons stated, reversed, and a new trial granted to it.

Affirmed in part, and reversed in part.